Appeal No. 2014-1325

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## IN RE: PEACH STATE LABS, INC.

Appeal from the Patent Trial and Appeal Board
Appeal No.  2013-008300
*Ex Parte* Reexamination No. 90/011,628

---

## SECOND CORRECTED BRIEF OF PETITIONER
## PEACH STATE LABS, INC.

---

MITCHELL G. STOCKWELL
D. CLAY HOLLOWAY
JENNIFER L. BLACKBURN
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
(404) 815-6500
*Attorneys for Petitioner,*
*Peach State Labs, Inc.*

# CERTIFICATE OF INTEREST

Counsel for Peach State Labs, Inc. certifies the following:

1.      The full name of every party represented by us is:

Peach State Labs, Inc.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

Not applicable.

3.      All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party represented by us are:

Not applicable.

4.      The names of all law firms and their partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this court are:

KILPATRICK TOWNSEND & STOCKTON LLP:  Jennifer L. Blackburn, D. Clay Holloway, Wendy A. Choi[1], Mitchell G. Stockwell.


Dated:  June 17, 2014                                    /s/Jennifer L. Blackburn
                                                                Jennifer L. Blackburn

---

[1] At the time she represented Appellant, Peach State Labs, Inc. at the Patent Office in this proceeding Ms. Choi was a partner at Kilpatrick Townsend & Stockton LLP.  Ms. Choi is now a partner at the law firm of Ballard Spahr, LLP.  Ms. Choi is no longer representing Appellant in this proceeding.  Ballard Spahr, LLP has never represented Appellant in this proceeding.

C-1

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................C-1

TABLE OF AUTHORITIES ......................................................................iv

STATEMENT OF RELATED CASES ..........................................................1

JURISDICTIONAL STATEMENT ..............................................................1

ISSUES PRESENTED ON APPEAL...........................................................2

STATEMENT OF THE CASE....................................................................2

STATEMENT OF FACTS .........................................................................3

I.     The '279 Patent Describes and Claims a Novel Method of Safely
       Removing Calcium Carbonate Contaminants. ...............................3

       A.     Specification......................................................................3

              1.     Summary ....................................................................3

              2.     Detailed Description of the Claimed Invention ........6

       B.     Claims.................................................................................9

II.    U.S. Patent No. 4,466,893 ("Dill") Discloses a Method for Fracturing
       Subterranean Rock Formations. ..................................................10

SUMMARY OF ARGUMENT .................................................................12

ARGUMENT .......................................................................................13

I.     STANDARD OF REVIEW.............................................................13

       A.     Claim Construction ..........................................................13

       B.     Obviousness......................................................................14

II.    THE PTO ERRED IN CONSTRUING TWO CRITICAL CLAIM
       TERMS. ....................................................................................14

       A.     The PTO Erred by Failing to Give the term "Dispersions" its
              Broadest Reasonable Interpretation. ................................15

i

B. This Court Should Adopt and Apply Appellant's Claim Interpretation for "Dispersions.".........................................................21

C. The PTO's Interpretation Cannot be the Broadest Reasonable Interpretation Because it is Narrower than the District Court's Interpretation of the Same Phrase. ........................................................24

D. The District Court's Interpretation Should Carry Significant Weight Because the '279 Patent will Expire Prior to the Conclusion of this Proceeding...........................................................26

E. The PTO Erred by Failing to Give the Term "Adding" its Broadest Reasonable Interpretation. ...................................................27

III. The PTO Erred in Finding Claim 1 of the '279 Patent Obvious over Dill in view of Admitted Prior Art. .............................................................31

A. Under the Correct Claim Interpretation, the PTO Erred in Finding Dill to be Analogous Art........................................................31

1. The PTO Erred in Finding Dill and the '279 Patent in the Same Field of Endeavor..............................................................32

2. The PTO Erred by Ignoring In re Clay. ...................................36

3. The PTO Erred by Finding Dill and the '279 Patent Related to the Same Problem.....................................................37

B. The Differences in Dill and the Claimed Invention are too Great for Dill to Make the Claims Obvious.................................................44

C. Under the Correct Interpretation, The Board Erred in Finding there is No Nexus between Appellant's Secondary Indicia of Non-Obviousness and the Claimed Invention.....................................44

1. The Board Narrowed Applicant's Evidence of Secondary Considerations Based on Incorrect Claim Scope......................44

2. Appellant's Evidence of Secondary Considerations Outweighs any Prima Facie Case of Obviousness. .................47

a.     Appellant has Demonstrated a Nexus between the Claims and ALL of its Evidence of Secondary Considerations. .................................................49

b.     Products Used to Practice the Method Claimed in the '279 Patent have Enjoyed Commercial Success. ....................................................................52

  i.     Legal Requirements for a finding of Commercial Success. ...........................................52

  ii.    Appellant has Demonstrated a Nexus between the Commercial Success and the Claimed Invention. .............................................53

  iii.   Appellant's Sales Data Demonstrate Commercial Success. ...........................................55

c.     Appellant's Invention has been Copied by Others. ........59

d.     Appellant's Invention has Received Praise in the Industry. ....................................................................60

CONCLUSION .................................................................................61

CERTIFICATE OF COMPLIANCE .............................................63

# TABLE OF AUTHORITIES

**Cases**

*Adams Respiratory Therapeutics, Inc. v. Perrigo Company*,
  616 F.3d 1283 (Fed. Cir. 2010) ....................................................18

*Altiris Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003) ............................................ 28, 29

*Cable Elec. Prods. Inc. Genmark, Inc.*,
  770 F.2d 1015 (Fed. Cir. 1985) ........................................... 52, 60

*Flo Healthcare Solutions, LLC v. Kappos*,
  697 F.3d 1367 (Fed. Cir. 2012) ...................................................25

*Gambro Lundia AB v. Baxter Health Care Corp.*,
  110 F.3d 1573 (Fed. Cir. 1997) ...................................................52

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)........................................................................31

*In re Abbott Diabetes Care, Inc.*,
  696 F.3d 1142 (Fed. Cir. 2012) ........................................... 13, 15

*In re Baker Hughes, Inc.*,
  215 F.3d 1297 (Fed. Cir. 2000) ..................................... 13, 14, 25

*In re Bigio*,
  381 F.3d 1320 (Fed. Cir. 2004) ....................................... 31, 32, 33

*In re Clay*,
  966 F.2d 656 (Fed. Cir. 1992) ............................................ passim

*In re ICON Health and Fitness, Inc.*,
  496 F.3d 1374 (Fed. Cir. 2007) ...................................................14

*In re Pagliaro*,
  657 F.2d 1219 (C.C.P.A. 1981)...................................................31

*In re Sernaker*,
  702 F.2d 989 (Fed. Cir. 1983) ............................................ 47, 53

*In re Soni*,
    54 F.3d 746 (Fed. Cir. 1995) .................................................. 56, 57

*In re Wood*,
    599 F.2d 1032 (C.C.P.A. 1979) ....................................................35

*J.T. Eaton & Co., v. Atlantic Paste & Glue Co.*,
    106 F.3d 1563 (Fed. Cir. 1997) ........................................ 52, 53, 55

*Jones v. Hardy*,
    727 F.2d 1524 (Fed. Cir. 1984) ....................................................47

*Kansas Jack, Inc. v. Kuhn*,
    719 F.2d 1144 (Fed. Cir. 1983) ....................................................52

*Midwest Indus., Inc. v. Karavan Trailers, Inc.*,
    175 F.3d 1356 (Fed. Cir. 1999) ....................................................52

*Nazomi Commc's, Inc. v. ARM Holdings, PLC*,
    403 F.3d 1364 (Fed.Cir. 2005) ....................................................30

*Neupak, Inc. v. Ideal Mfg. & Sales Corp.*,
    41 F. App'x. 435 (Fed. Cir. 2002) ........................................ 52, 53

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ................................ 14, 16, 22, 30

*Rambus v. Rea*,
    731 F.3d 1248 (Fed. Cir. 2013) ....................................................26

*Schumer v. Lab Computer Sys., Inc.*,
    308 F.3d 1304 (Fed. Cir. 2002) ....................................................19

*SRI International v. Matsushita Elec. Corp.*,
    775 F.2d 1107 (Fed. Cir. 1985) ....................................................22

*Vitronics Corp. v. Conceptronic Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ........................................ 13, 14, 18

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ......................................................................1

35 U.S.C. § 141 .....................................................................................1

35 U.S.C. § 305 ...................................................................................26

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| '279 Patent | United States Patent No. 5,672,279 |
| AXXX | Indicated Appendix Page |
| Board | Patent Trial & Appeal Board |
| Dill | U.S. Patent No. 4,466,893 |
| EMS | Third Party Requester, Environmental Manufacturing Solutions, LLC |
| HCL | Hydrochloric acid |
| PSL | Appellant Peach State Labs, Inc. |
| PTAB | Patent Trial & Appeal Board |
| PTO | Board or the Patent Examiner of the United States Patent and Trademark Office |
| UHCL | Urea hydrochloride |

## STATEMENT OF RELATED CASES

No appeal from the same United States Patent and Trademark Office proceeding was previously before this or any other appellate court.

U.S. Patent No. 5,672,279 is the subject of *Peach State Labs, Inc. v. Environmental Manufacturing Solutions, LLC*, Case No. 6:09-CV-395-ORL-28-DAB, currently pending in the U.S. District Court for the Middle District of Florida, Orlando Division. That case currently is stayed and the outcome will be directly affected by this Court's decision in this Appeal.

## JURISDICTIONAL STATEMENT

This appeal involves *Ex Parte* Reexamination No. 90/011,628 involving United States Patent No. 5,672,279 (hereafter the "'279 Patent").

On January 17, 2014 Patent Owner Peach State Labs, Inc. filed a Notice of Appeal (A3204 – A3206) of the Decision on Appeal (A0001 – A0030) dated November 18, 2013 by the Patent Trial and Appeal Board of the United States Patent and Trademark Office (hereafter "PTAB" or "Board"), docketed under Appeal No. 2013-008300.

Jurisdiction is proper under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141.

1

**ISSUES PRESENTED ON APPEAL**

1.      Whether the PTO erred in applying the broadest reasonable interpretation standard by interpreting the term "dispersions" to mean only "aqueous dispersions" and to exclude other forms of dispersions.

2.      Whether the PTO erred in applying the broadest reasonable interpretation standard by interpreting the term "adding" to mean only bulk addition and to exclude alternative means of "adding."

3.      Whether the PTO erred in finding Claim 1 of the '279 patent obvious over Dill in view of Admitted Prior Art when it:

    a.  under an improper claim construction applied non-analogous art, and

    b.  under an improper claim construction failed to find a nexus between proper claim scope and Appellant's evidence of secondary considerations and failed to give proper weight to that evidence?

**STATEMENT OF THE CASE**

This case involves an appeal by Appellant, Peach State Labs, Inc. (PSL) of the Decision on Appeal (A0001 – A0030) dated November 18, 2013 rendered by the Patent Trial and Appeal Board of the United States Patent and Trademark Office, affirming the Examiner's rejection of claims 1-5 of U.S. Patent No. 5,672,279.  The technology involves safe industrial cleaning, particularly methods of safely dissolving water-insoluble calcium carbonate.

The reexamination that is the subject of this appeal was filed **_after_** a jury trial on the '279 patent and a verdict of infringement against third party requester Environmental Manufacturing Solutions (EMS), which took place **_after_** the issue of validity was decided by the district court on summary judgment, which occurred **_after_** the court held a full day *Markman* hearing with expert testimony on both sides. Moreover, that litigation was brought by third party requester EMS seeking a declaratory judgment of non-infringement and **_invalidity_**. Thus, after losing at the district court, EMS initiated this proceeding and sought and received a stay of the entry of final judgment against EMS.

## STATEMENT OF FACTS

The '279 Patent issued on September 30, 1997. A0051 – A0055. The inventors include Richard Sargent, President and CEO of Appellant/Patent Owner PSL. A0051.

## I. THE '279 PATENT DESCRIBES AND CLAIMS A NOVEL METHOD OF SAFELY REMOVING CALCIUM CARBONATE CONTAMINANTS.

### A. Specification

#### 1. Summary

The '279 patent relates to methods of removing unwanted contaminants from fluids and surfaces where the unwanted contaminants are in the form of calcium carbonate suspensions and dispersions, i.e. methods to "clean" the fluids

3

and surfaces. A0052 (1:24-44, 1:56-67). The specification explains that "[c]alcium carbonate is often used or produced in industrial processes," including as a neutralizing agent, as a filler/extender, in tooth powders, in Portland cement, and in paper production and recycling water. A0052 (1:15-23). When calcium carbonate is used or produced in an industrial process, it can build up on surfaces and in liquids and adversely affect the process and equipment and/or make process streams difficult to dispose of. A0052 (1:24-34). "Calcium carbonate is also a major cause of boiler scale when hard water is used in heating systems. It is sometimes difficult to remove the calcium carbonate boiler residue in a manner that does not adversely affect the equipment." A0052 (1:40-43).

Prior to the '279 patent standard practice was to dissolve calcium carbonate contaminants using hydrochloric acid ("HCL"), thereby cleaning process streams and equipment, and then after the calcium carbonate was converted to calcium chloride, adjusting the pH to approximately neutral with base. A0052 (1:34-37); *see also* A2383 (lines 3-6 (conceding that it was common knowledge HCL and calcium carbonate react to form calcium chloride)). The downside to using this prior art cleaning process was that "hydrochloric acid is a gas that can corrode equipment and is noxious to humans." A0052 (1:37-39).

The inventors thus looked for a way to remove calcium carbonate from process equipment and streams without using a corrosive, noxious acid.

4

Specifically, the inventors sought to "provide a method to remove the build-up of water-insoluble metal salts on surfaces[,] . . . to lower the solids content of industrial liquids that contain water-insoluble metal salts[,] . . . for the treatment of effluent from paper manufacturing and recycling processes[, and] . . . for the removal of water-insoluble salt residue from masonry."  A0052 (1:56-67).

To that end, the inventors determined that "[u]rea hydrochloride is especially useful in the removal or dissolution of calcium carbonate," is "less corrosive to metal equipment and other contact surfaces than the equivalent amount of hydrochloric acid, and has a significantly less tendency to release hydrogen chloride gas." A0052 (2:8-10, 2:25-28).  That is, they determined that UHCL reacts with calcium carbonate to produce a water soluble metal salt and does so _safely_.  The inventors further determined that suitable salts of UHCL are those formed by combining molecules of urea and hydrochloric acid in a 1:4 to 4:1 ratio, with preferred compositions formed from 1:1 or 1:2 ratios.  A0052 (2:13-19).

The inventors provided two examples of methods of using UHCL according to the claimed invention.  The two examples were a use of UHCL to clean calcium carbonate from the surface of masonry and a use of UHCL to clean calcium carbonate deposits in the form of boiler scale.  A0054 – A0055 (6:64-7:10).

5

## 2.     Detailed Description of the Claimed Invention

As explained above, the 279 patent is directed to cleaning calcium carbonate suspensions and dispersions from water-based liquids and from surfaces contacting the water-based liquids.  The inventors captured their invention in the claims by reciting "[a] method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate . . . ."  A0055 (Claim 1).  The calcium carbonate used or produced in industrial processes that causes the problems addressed by the inventors is in suspension and/or dispersion in those processes.

Suspensions and dispersions are systems where particles are distributed throughout a bulk substance.  A2585 (¶ 4).  In a suspension, the bulk substance generally is a fluid, while in a dispersion the bulk substance can be a solid, liquid, or gas.[2]  A2585 – A2586 (¶ 5-7).  For convenience, herein a dispersion where the bulk phase is a solid is referred to as a "solid dispersion" and a dispersion where the bulk phase is a liquid is referred to as a "liquid dispersion."

During reexamination, the PTO acknowledged that a dispersion may have a solid bulk phase.  A2373 ("There is no dispute that 'dispersion' includes dispersion in medium of solid, liquid or gas, as discussed in the Tolbert Decl.").  The PTO further acknowledged that a solid dispersion on a surface can be converted to a suspension or liquid dispersion with agitation or abrasion.  *See* A0010 ("Patent

---

[2] When the bulk substance is a fluid, sometimes the words suspansions and dispersions are used interchangeably.  A2585 – A2586 (¶ 6).

Owner provided adequate evidence that applying a solution of urea hydrochloride to a solid deposit of calcium carbonate would result in a suspension of calcium carbonate.")   Alternatively, particles in a suspension can become particles in a solid dispersion if they settle but maintain similarity to their suspended state, such as being surrounded by water molecules, or surrounding water molecules or other solids.   A2586 (¶ 7).   Thus, small particles of calcium carbonate suspended or dispersed in a process fluid can settle to the surface of the process equipment and form a dispersion.   If enough small particles settle to the surface, the solid calcium carbonate can form the bulk phase of a solid dispersion with any trapped water or solid impurities forming the dispersed phase.   A2586 (¶ 7).

By reciting "calcium carbonate in aqueous suspensions and dispersions of calcium carbonate" in the claims, the inventors accurately and precisely claimed their cleaning method.   The invention for the first time uses UHCL to remove those suspensions and dispersions without damaging the process equipment by carefully converting the calcium carbonate particles in the liquid or deposited on the surface to a water soluble salt.   A0055 (claim 1).   Moreover, the invention prevents calcium carbonate, or other water insoluble salts, from forming.   The specification teaches that certain salts of urea should not be used because they form new water-insoluble salts, for example, urea sulfate cannot be used because it reacts with calcium carbonate to form the water-insoluble salt calcium sulfate.   A0054 (5:7-

10). Thus, the method of the invention removes calcium carbonate in a way that prevents any water-insoluble salt from forming, including preventing calcium carbonate from re-forming.

The patent provides four examples, the first two of which describe how to make the UHCL solution, which method is not claimed. The remaining examples illustrate methods of "remov[ing] the build-up of water-insoluble metal salts **_on surfaces_**, and the dissolution of water-insoluble metal salt **_dispersions_** or suspensions." A0054 (6:56-59 (emphasis added)).

Examples 3 and 4 illustrate methods of the claimed invention. A0054 – A0055 (6:56-7:10). Example 3 describes using UHCL to clean calcium carbonate from a masonry surface. A0054 – A0055 (6:64-7:2). The solution is applied to the masonry while the masonry optionally is brushed or abraded. A0054 – A0055 (6:64-7:2). Then the masonry is rinsed with water. A0055 (7:1-2). Example 4 describes removing boiler scale by filling the boiler with a solution of UHCL while carbon dioxide gas evolves and flushing the boiler. A0055 (7:6-10).

The inventors of the '279 patent faced a challenging problem. While acids react with calcium carbonate, use of known acids to dissolve calcium carbonate was not ideal for several reasons: (1) hydrochloric acid (HCl) was known to be corrosive, and (2) other acids, such as sulfuric acid, react with calcium carbonate to form other insoluble salts, e.g. calcium sulfate. A0052 (1:34-39); A0054 (5:7-10).

The inventors thus sought an acid that was safe, but strong enough to effect the two step reaction of dissolving calcium carbonate, and that would produce a water soluble salt rather than another water insoluble salt.

A person skilled in the art at the time of the invention knew that to moderate the harmful effects of the acid, the acidity must be reduced. But if the acidity is reduced too much the acid would be unable to covert the calcium carbonate to the water soluble salt calcium chloride.  Conversion of calcium carbonate to calcium chloride is a two-step process, and it is possible for an acid to effect the first step but not the second step.  A2505 (¶ 11 (explaining that urea will accept a proton in the first step and remain strong enough to effect the second step, but many bases after accepting a proton in the first step would be incapable of effecting the second step of protonating bicarbonate and converting it to calcium chloride)).  None of the prior art available to the inventors at the time of the invention taught the ability of urea to moderate the acidity of hydrochloric acid in such a way that the hydrochloric acid became safe and also retained the ability to completely convert calcium carbonate to calcium chloride.

### B.    Claims

The claims recite:

> 1.    A method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt,

wherein a molar ratio of urea to hydrochloric acid approximately between 1:4 and 4:1 is used to form said urea hydrochloride.

2.    The method of claim 1, wherein the calcium carbonate is in paper manufacturing process water.

3.    The method of claim 1, wherein said ratio of urea to hydrochloric acid is approximately 2:1.

4.    The method of claim 1, wherein said ratio of urea to hydrochloride acid is approximately 1:1.

5.    The method of claim 1, wherein the calcium carbonate is in paper recycling process water.

## II.    U.S. PATENT NO. 4,466,893 ("DILL") DISCLOSES A METHOD FOR FRACTURING SUBTERRANEAN ROCK FORMATIONS.

U.S. Patent No. 4,466,893 to Dill ("Dill") is directed to subterranean drilling.  Dill discloses a method of acidizing or fracturing a subterranean formation to extract more oil or natural gas.  A3271 (1:9-17).  The methods of Dill create fractures in and etch the surfaces of the subterranean rock.  A3271 (1:25-28).  Thus, Dill teaches destruction of a subterranean formation to extract oil and natural gas.

Dill explains that its invention relates to acid treating or acidizing of subterranean formations.    A3271 (1:9-10).    Dill discusses acidizing fluids generally, and suggests those fluids react with a variety of reactive materials. A3271 (1:29-32 (The rate of reaction depends on "the *type* of reactive material encountered, etc.")).    Dill explains that the acidizing fluids are pumped into formation under pressure, and Dill aimed to extend the reaction time of the fluid

while making the thickening/viscosifying agents in the fluid more stable. A3271 (1:37-55). Another problem noted by Dill was release of corrosive fumes as acid is injected down the well bore. A3271 (1:56-58). Dill's solution was a combination of a selected thickening or gelling agent, urea, and any of four acids. A3271 (1:65-2:2). The urea "extend[s] the viscous stability of the gelled acidizing composition in comparison to the viscous stability of a composition comprising the acid and selected gelling agent alone." A3271 (2:15-21).

Subterranean formations are formed and exist under conditions of high temperature and pressure. Moreover, the compositions of Dill are intended to be pumped into the subterranean formations under high pressure. A3271 (1:37-41). Accordingly, the examples in Dill describe testing the compositions under high temperatures and pressures to mimic the conditions of a subterranean formation. A3272 (Example II, 500 psi and 250 °F); *see also* A2589 (¶ 13 (Dill uses "a high pressure cell and elevated temperature as proxy for subterranean formations.")). Similarly, to mimic the composition of the subterranean formation, Dill teaches testing the compositions on a unique dense crystalline rock, Icelandic spar. A3272 (4:41-43); A2589 – A2590 (¶ 13). Thus, the entire disclosure of Dill is related to extreme conditions under which subterranean formations are formed and exist.

## SUMMARY OF ARGUMENT

The PTO failed to use the broadest reasonable interpretation of the claim term "dispersions." The PTO admitted the plain meaning of the claim term "dispersions" "includes dispersion[s] in medium[s] of solid, liquid, or gas." A2373 ("There is no dispute that 'dispersion' includes dispersion in medium of solid, liquid or gas."). The PTO then used an interpretation narrower than the plain meaning, and narrower than the district court's claim construction in a related proceeding, without any special meaning or disclaimer in the specification or prosecution history.

The PTO failed to use the broadest reasonable interpretation of the claim term "adding." The claims and the specification make clear that the order of addition of UHCL and calcium carbonate in suspension or dispersion is irrelevant. Absent a **_requirement_** for a particular order, the claim should not be interpreted to recite one.

Based on its erroneous claim construction, the PTO applied non-analogous art, ignoring precedent from this Court holding that in an almost identical situation, prior art related to methods carried out in natural, underground, subterranean formations was non-analogous to claims directed to ambient processes in man-made equipment. Even if the art were properly applied, however, the differences in the prior art and the claimed invention are too great for the prior art to make the

12

claims obvious, particularly where the prior art method and the claimed method are used under extremely different conditions. Moreover, based on its erroneous claim construction, the PTO failed to find a nexus between the claims and Appellant's evidence of secondary considerations of non-obviousness. Under the correct claim construction, Appellant's evidence has the proper nexus and is sufficient to overcome any *prima facie* case of obviousness.

## ARGUMENT

## I.    STANDARD OF REVIEW

### A.    Claim Construction

Claim construction by the PTO is a question of law this Court reviews *de novo*. *In re Baker Hughes, Inc.*, 215 F.3d 1297, 1301 (Fed. Cir. 2000). "[C]laims under examination before the PTO are given their broadest reasonable interpretation consistent with the specification." *In re Abbott Diabetes Care, Inc.*, 696 F.3d 1142, 1148 (Fed. Cir. 2012); *see also Baker Hughes*, 215 F.3d at 1303 (finding the Board adopted a construction beyond that which was reasonable in light of the written description).

Claims are given their ordinary and customary meaning unless it is clear from the specification that the inventor acted as his own lexicographer and used a term in a manner inconsistent with its ordinary meaning. *Vitronics Corp. v. Conceptronic,*

*Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005); *Baker Hughes*, 215 F.3d at 1302-03.

The prosecution history also is relevant to determining a claim term's ordinary meaning because the prosecution history provides "evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. The scope of a claim term may be narrowed from the ordinary meaning only if the inventor has made a clear and intentional disavowal of claim scope. *Vitronics,* 90 F.3d at 1582-83; *Phillips*, 415 F.3d at 1316.

### B. Obviousness

Whether a claim would have been obvious is a question of law, which is reviewed *de novo*, based on underlying facts, which are reviewed for substantial evidence. *In re ICON Health & Fitness, Inc.,* 496 F.3d 1374, 1378 (Fed. Cir. 2007).

## II. THE PTO ERRED IN CONSTRUING TWO CRITICAL CLAIM TERMS.

Under governing claim construction principles, the PTO erred in its interpretation of the terms "dispersions" and "adding." The PTO's interpretation of "dispersions" is not the broadest reasonable interpretation, nor is it the correct claim construction, because, despite absence of a special definition or clear disclaimer, it is narrower than the undisputed plain meaning, it imports a limitation not found in the claim, reads out a preferred embodiment, and is narrower than the

construction used for the same term by the district court in a related proceeding. The PTO's interpretation of "adding" is not the broadest reasonable interpretation because it reads in an order of steps that is not required by the claim or specification and is narrower than the interpretation of a person skilled in the art.

In short, the constructions utilized by the PTO are not the ***broadest*** reasonable interpretations read and gleaned in light of the specification. *In re Abbott Diabetes*, 696 F.3d at 1149. Rather, the constructions ignore the claimed and described invention, causing the PTO to improperly apply art and improperly omit evidence of secondary indicia of non-obviousness to obtain an erroneous result on the question of obviousness.

## A. The PTO Erred by Failing to Give the term "Dispersions" its Broadest Reasonable Interpretation.

The PTO erred by interpreting the term "dispersions" to include only "aqueous dispersions" and to exclude other dispersions. It is undisputed that the plain meaning of "dispersions" includes dispersions having solid, liquid, or gas bulk phases. A2373 ("There is no dispute that 'dispersion' includes dispersion in medium of solid, liquid or gas."). No special definition of "dispersions" is expressly stated or implied in the claims or specification and the patentee made no clear disclaimer. Thus, the broadest reasonable interpretation includes the full scope of the ordinary meaning of "dispersions," and the PTO's narrower interpretation encompassing only "aqueous dispersions" is incorrect.

15

The PTO erred by selecting an interpretation narrower than the plain meaning of the term, propounded by the third party requester, and then looking for support for that interpretation in the specification and prosecution history. Deviation from a term's plain meaning, however, requires more than just isolated instances of support for a narrower interpretation. As explained above it requires (1) a "special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess," or (2) "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Phillips*, 415 F.3d at 1316. Neither is present here, and thus the PTO erred in its broadest reasonable interpretation analysis.

Claim 1 recites a method to solubilize two alternative forms of calcium carbonate: (1) "calcium carbonate in aqueous suspensions" and (2) "dispersions of calcium carbonate." A0055 (Claim 1). The PTO conceded that the plain meaning of "dispersions" includes dispersions having solid, liquid, or gas bulk phases. A2373. The specification of the '279 patent expresses no preference for one type of dispersion over the others and discloses and exemplifies dispersions having solid and liquid bulk phases.

The specification explains that a disadvantage of using calcium carbonate is it "tends to build up as a deposit on surfaces, or form a dispersion in water-based liquids" and such "residues and dispersions can be a nuisance or, more

importantly, can adversely affect industrial processes or equipment." A0052 (1:24-29). The specification thus teaches that the deposits, or residues, are dispersions that the claimed method aims to address through solubilization. Indeed, the specification declares the objective of addressing these concerns by providing a method that not only lowers the solids content of liquids by dealing with aqueous suspensions, but also aims to "remove the build-up of water-insoluble metal salts on surfaces" or "remove[] . . . water-insoluble salt residue from masonry." A0052 (1:56-67). The Abstract and detailed description summarizes the inventive method as one "to remove the build-up of water-insoluble metal salts on surfaces, and to dissolve water-insoluble metal salt dispersions or suspensions . . . ." A0051 (Abstract); A0052 (2:21-25).

Examples 3 and 4 in the detailed description expressly teach skilled persons that the claimed dispersions include deposits. The specification introduces Examples 3 and 4 as procedures "for the removal of build-up of water-insoluble salts on *surfaces*, and the dissolution of water-insoluble metal salt dispersions or suspensions." A0054 (6:57-59). Example 3 describes a procedure to clean masonry, where calcium carbonate dispersions build up from the cement used to lay bricks or blocks. A0052 (1:19-20 (explaining calcium carbonate "is also used in Portland cement")); A0054 – A0055 (6:62-7:2). Example 4 describes a procedure to "clean boiler scale," which the '279 patent earlier explains is a solid

17

residue of calcium carbonate left on boiler equipment when hard water is used in a heating system and then removed. A0052 (1:40-42); A0055 (7:6-10). In both examples, the process results in dissolving the dispersion on the masonry or boiler walls.

These examples expressly teach using the method to dissolve calcium carbonate dispersions as scale residue or cement deposits. The embodiments disclosed thus confirm that the claimed method of solubilizing suspensions or dispersions encompasses solubilizing the calcium carbonate present within a liquid _and_ solubilizing the calcium carbonate deposits. An interpretation of a patent claim that renders disclosed embodiments outside the scope of the claim is "rarely, if ever, correct and would require _highly persuasive evidentiary support_." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010) (quoting *Vitronics,* 90 F.3d at 1583-84 (emphasis added)). The PTO's interpretation requiring the dispersions to be aqueous has little, if any, evidentiary support, and is inconsistent with the specification and prosecution history. Accordingly, the PTO's interpretation is not the broadest reasonable interpretation.

The PTO erred in importing the term "aqueous" into the claim to describe "dispersions." The claim, however, recites "calcium carbonate in aqueous suspensions _or_ dispersions of calcium carbonate." A0055 (emphasis added). The Federal Circuit has consistently interpreted the word "or" to indicate alternatives.

*Schumer v. Lab Computer Sys., Inc.*, 308 F.3d 1304, 1311 (Fed. Cir. 2002) (listing cases). The alternatives here are "calcium carbonate in aqueous suspensions" and "dispersions of calcium carbonate." It is grammatically and logically incorrect to insert the adjective "aqueous" from the first phrase into the second phrase. Moreover, such a modification is inconsistent with the specification, as explained in detail above. The specification discloses calcium carbonate as a suspended solid in water-based effluent. A0052 (1:29-32). By contrast, the specification never describes dispersions as "aqueous," but does describe solid deposits of calcium carbonate, including "scale" on surfaces. A0052 (1:24-26, 1:40-43); A0055 (7:6-10). Thus, while the "suspensions" are aqueous, the "dispersions" are not so limited.

The PTO further erred by relying on an amendment in the prosecution history as "supporting" the PTO's claim construction. During prosecution, the patentee amended claim 1 to address the original examiner's concern about claim definiteness by changing "undesirable solids" to "calcium carbonate in aqueous suspensions or dispersions of calcium carbonate." A2270. The PTO found that amendment and an argument that the invention (in one embodiment) was useful to treat effluent supported its overly narrow construction. A0006 – A0008. However, while applicants arguably gave up claim scope *intermediate between* "undesirable solids" and "calcium carbonate in aqueous suspensions or dispersions

of calcium carbonate," neither the amendment nor the argument altered the plain meaning of the claim terms added in the amendment, which includes dispersions in solid and liquid bulk phases. The remainder of the original prosecution history confirms the patentee never intended to disclaim solid dispersions.

As support for the above amendment, the patentee identified pages 1-3 of the specification as-filed, which correspond to col. 1, line 15 – col. 2, line 10 of the issued patent and describe calcium carbonate as forming deposits or residues. A2274. Thus, the patentee ensured its clarifying amendment would be understood by the Examiner as continuing to cover both removal of the deposits and residues of calcium carbonate. Indeed the examiner did understand, because in the only subsequent rejection he argued that (1) "Young discloses . . . utiliz[ing] urea-sulfuric acid compositions . . . to dissolve and remove calcium carbonate [from] ***various types of surfaces***" and (2) that Young, in view of Sargent, rendered it obvious to use "urea hydrochloride . . . in ***scale removal and solvation processes***." A2282 (emphasis added).

Moreover, the patentee's final response contained the Moss Declaration that the Examiner ultimately found persuasive. The Moss Declaration details the "ability of hydrochloric acid to solubilize calcium carbonate ***deposits*** better than sulfuric acid." A2611 (¶ 11).

In short, throughout prosecution the applicants maintained the claimed method for converting calcium carbonate to a water-soluble salt included treating both calcium carbonate in water-based liquids and calcium carbonate deposits – points the PTO understood otherwise the original Examiner's use of Young in the second Office Action was completely misplaced.  The original examiner allowed the claims because he determined the patentee had supplied a novel, nonobvious method to address the removal of dispersions, such as scale, and dissolution of calcium carbonate contained in water, such as effluent.  Here the prosecution history provides evidence of how the examiner and the inventor understood the patent, and that understanding is broader than the PTO's current claim interpretation.    Accordingly, the PTO's interpretation is not the ***broadest*** reasonable interpretation.

**B.    This Court Should Adopt and Apply Appellant's Claim Interpretation for "Dispersions."**

Appellant's interpretation of "calcium carbonate in aqueous suspensions or dispersions of calcium carbonate" is "insoluble particles of calcium carbonate distributed in water or calcium carbonate in a system of two or more distinct phases consisting of finely divided particles dispersed through a bulk substance." Appellant's interpretation encompasses the plain meaning of "dispersion of calcium carbonate," which includes calcium carbonate particles dispersed in a bulk

21

liquid medium and also particles dispersed in a solid medium, where either the particles or the solid medium are calcium carbonate.

The PTO asserts that Appellant's claim construction is incorrect because "Patent Owner did not point to supporting disclosure in the '279 patent where this "solid-in-solid dispersion" is described or extrinsic evidence that the build-ups described in the '279 Patent are solid-in-solid dispersions. A0009. Appellant has explained above where the specification provides support for certain types of solid-in-solid dispersions. Even so, the law does not require a patent applicant to disclose every conceivable embodiment of his invention. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985). Patent specifications are written for persons *skilled in the art*, and an inventor need only describe the "best mode" of making and using the invention known to him at the time of the application. *Id.* Moreover, the claims are presumed to have their ordinary meaning *unless* it is clear that a narrower construction was intended. *Phillips*, 415 F.3d 1316. Thus, it is the PTO who must provide evidence of a special definition or clear disclaimer to overcome that presumption.

In any case, Appellant has provided extrinsic evidence that the PTO says is missing. Appellant established that the build-up of calcium carbonate described in the '279 patent would be considered a solid-in-solid dispersion. The '279 patent teaches that calcium carbonate used in industrial processes "tends to build up as a

*deposit* on surfaces." A0052 (1:25-26). The specification includes specific examples of "procedures for the removal of the buildup of water insoluble metal salt dispersions or suspensions" where those procedures clean masonry and clean scale from the surface of a boiler, both solid deposits of calcium carbonate. A0054 – A0055 (6:64-7:10).

During the reexamination, Appellant submitted declarations of Dr. Laren Tolbert, and PTAB found Dr. Tolbert "qualified to testify as to the matters in his declaration." A0008. Dr. Tolbert testified that "dispersions can be solids within solids," and that such dispersions can form when suspended solids settle onto a surface and agglomerate. A2586 (¶ 7). Dr. Tolbert testified that these "*deposited* particles" are a solid-in-solid dispersion, if they are dispersed in another solid or surround other dispersed particles. A2586 (¶ 7 (emphasis added)). Dr. Tolbert concluded that he interprets the '279 patent claims to cover calcium carbonate in both suspensions and dispersions, "including solid dispersions." A2586 (¶ 7). Accordingly, Appellant established that the build-up of calcium carbonate described in the '279 patent would be considered a solid-in-solid dispersion.

The Board's interpretation of the term "dispersions" to *exclude* dispersions other than aqueous dispersions diverges from the undisputed plain meaning without any compelling reason for doing so and is thus incorrect. The correct interpretation is Appellant's: "calcium carbonate in a system of two or more

23

distinct phases consisting of finely divided particles dispersed through a bulk substance." This Court should adopt and apply that interpretation.

**C. The PTO's Interpretation Cannot be the Broadest Reasonable Interpretation Because it is *Narrower* than the District Court's Interpretation of the Same Phrase.**

The reexamination that is the subject of this proceeding was filed ***after*** a district court had conducted claim construction proceedings, including a *Markman* hearing. A0496 – A0513. Where a reexamination is conducted ***after*** a district court has engaged in claim construction, the PTO should not do its broadest reasonable interpretation analysis in a vacuum in ignorance of the court's efforts.

The U.S. District Court for the Middle District of Florida, in an adversarial proceeding, thoroughly analyzed the specification and prosecution history of the '279 patent and received testimony from experts on both sides. A0496 – A0513. The court found the specification failed to alter the plain meaning of "dispersion" and the prosecution history was "ambiguous at best." A0503 – A0505. The court found no disclaimer and afforded "dispersions" it's plain and ordinary meaning. A0508 – A0509. Thus, the court interpreted "calcium carbonate in aqueous suspensions or dispersions of calcium carbonate" to mean "insoluble particles of calcium carbonate distributed in water or calcium carbonate in a system of two or more distinct phases consisting of finely divided particles dispersed through a bulk substance." A0513.

24

A district court interprets claim language in light of the specification, prosecution history, and extrinsic evidence such as dictionaries and expert testimony. The court is charged with finding "the one 'correct' interpretation." *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367, 1383(Fed. Cir. 2012), Newman, additional views ("Thus on appeal from the PTO to the Federal Circuit, the court reviews the PTO's decision for correctness, "just as we review claim construction by a district court." (quoting *Baker Hughes,* 215 F.3d at 1301).

In this case, during the related district court litigation, both Appellant and an infringer engaged expert witnesses, the experts submitted declarations and were deposed regarding claim construction, and the court received thorough briefing from both parties. A0735; A0703; A0890; A1350; A0826; A0860; A0709; A759; A1324; A1359. The court then held an evidentiary hearing, which lasted for a full day and included live testimony and demonstrations from experts on both sides. A0496 – A0513. The court made its findings and construed the claims on that thorough record, and its interpretation was ***broader*** than the PTO's current interpretation.

While the PTO's broadest reasonable interpretation standard is different from the standard used by the district court and the procedures for reviewing claims used by the PTO and district court also differ, when a district court expends substantial resources, including conducting a full day hearing, to analyze a patent

25

and interpret claims, the PTO should acknowledge the court's effort and give some weight to the court's findings. Conducting an entirely separate analysis is inconsistent with the interests of judicial economy and the mandate that *ex parte* reexaminations must proceed with "special dispatch within the Office." 35 U.S.C. § 305. Here, during the reexamination, the PTO failed even to acknowledge the district court's efforts or conclusion, leading to the dubious result that the PTO's "broadest reasonable construction" is <u>*narrower*</u> than the district court's construction. Accordingly, the PTO's interpretation cannot be the broadest reasonable interpretation.

### D. The District Court's Interpretation Should Carry Significant Weight Because the '279 Patent will Expire Prior to the Conclusion of this Proceeding.

The '279 patent expires September 30, 2014. While claims undergoing prosecution are generally given their broadest reasonable interpretation, review of the claims of an expired patent is similar to that of a district court's review. *Rambus v. Rea*, 731 F.3d 1248, 1252 (Fed. Cir. 2013). Here, the claim term at issue already has been the subject of rigorous district court review, as described above. Accordingly, the findings of the district court should be considered and should be given substantial weight. The broadest reasonable interpretation cannot be reasonable if it is narrower than the district court claim construction.

### E.   The PTO Erred by Failing to Give the Term "Adding" its Broadest Reasonable Interpretation.

The PTO erred by interpreting the term "adding" to exclude means of "adding" other than "the bulk addition of urea hydrochloride to a suspension or dispersion."   Where the calcium carbonate to be solubilized is in aqueous suspension, neither the claim language nor the specification expressly requires that the calcium carbonate be suspended in water prior to combination of the water with UHCL.

The term "adding" as used in claim 1 encompasses what the PTO refers to as "bulk addition" and also encompasses situations where an addition of UHCL causes the release of calcium carbonate from a surface, thereby creating a calcium carbonate suspension *in situ*.   In the latter case, "adding" is accomplished by creating a suspension in the presence of UHCL such that the UHCL and calcium carbonate in the suspension can react and/or by creating a suspension in a liquid to which UHCL continues to be added.

Claim 1 specifies that the method is directed to getting rid of water-insoluble calcium carbonate by solubilizing it.   A0055 (Claim 1).   The claim expressly requires combining UHCL and calcium carbonate to cause this conversion.   A0055 (Claim 1).   The specification confirms the procedure for the claimed reaction as providing UHCL to facilitate the reaction between the acid in the UHCL and the calcium carbonate resulting in the desired product -- a water-soluble salt.

27

The Board erred in dismissing Appellant's construction by focusing only on the "microscopic chemical reaction" that occurs at the surface of the calcium carbonate. That focus is misplaced because the release of calcium carbonate from the surface can be entirely or significantly *macroscopic*, i.e., *visible*. Upon reading the '279 patent, a skilled artisan would envision the embodiment wherein UHCL is combined with calcium carbonate causing a reaction that evolves carbon dioxide bubbles which expel particles or chunks of calcium carbonate thereby creating a suspension. A2636 (line 22) – 2637 (line 10).

Once the suspension of calcium carbonate is created, the UHCL solubilizes the suspension. In this case, as with "bulk addition," the claimed process proceeds as described in the specification. It matters not which came first – the suspension or the UHCL. While claim 1 does not explicitly recite a series of steps, case law regarding order of method steps is instructive. Steps of a method are not ordinarily construed to require an order unless an order is explicitly recited or implicitly required. *Altiris Inc. v. Symantec Corp.*, 318 F.3d 1363, 1370 (Fed. Cir. 2003). Here, all that is required for the solubilization is that the UHCL and the calcium carbonate in suspension can react. It is not necessary that the aqueous suspension be present prior to introduction of UHCL.

Indeed, that is how Example 3 works, and how the claim is understood by a person skilled in the art. Appellant submitted trial testimony of Dr. Kimberly

Kurtis, whom the district court found to be qualified to give opinion testimony within the field of material science. A2635 (lines 17-23). Dr. Kurtis testified based on her "expertise in materials like cement and concrete and the way in which different things act upon them" with the goal of "provid[ing] some insight into claim one of the ['279] patent and its use in cement and concrete and related minerals . . . ." A2633 (lines 12-20). Dr. Kurtis testified that during the method described in Example 3 in the specification, the calcium carbonate starts out as a solid dispersion and goes into an aqueous suspension, and that embodiment is covered by claim 1. A2636 (line 9) – A2637 (line 10). Thus, Appellant's interpretation of "adding" as encompassing a situation where the UHCL reacts with a deposit of calcium carbonate to _create_ an aqueous suspension of calcium carbonate is consistent with the understanding of a person skilled in the art.

The Board failed to present any evidence or argument that having the suspension present before the UHCL is _necessary_. _See Altiris_, 318 F.3d at 1370 ("nothing in the intrinsic evidence indicates that [one step] must be performed before the [other] step."). Absent such a requirement limiting the order of addition, the Board's interpretation is not the broadest reasonable interpretation and is incorrect.

The Board also erred by relying on a prior art process to interpret the claims. In support of its unreasonably narrow construction, the Board cites to a portion of

the '279 patent as allegedly describing "a typical process" in which hydrochloric acid is added to effluent to dissolve dispersed calcium carbonate. This comparison is inapposite because the cited portion of the '279 patent describes a typical *prior art* process, not the claimed invention. A0052 (1:34-39). Indeed, what is "typical[ly]" done in the art with respect to hydrochloric acid cannot be germane to determining the scope of the claims because the claims do not recite hydrochloric acid but rather UHCL. Moreover, the cited portion of the '279 patent refers to typical use of HCl in only one specific prior art method where the calcium carbonate is suspended in effluent. A0052 (1:34-39). As explained previously, the claimed invention is broader than treating effluent.

Even if the example relied on by the Board related to the claimed invention, however, this Court repeatedly has cautioned against confining claims to embodiments described in the specification. *Phillips*, 415 F.3d at 1323; *see also Nazomi Commc's, Inc. v. ARM Holdings, PLC,* 403 F.3d 1364, 1369 (Fed. Cir. 2005) (claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification"). Accordingly, the disclosure of one embodiment of "adding" must not be used to limit the interpretation of that term.

Accordingly, the Court should interpret the term "adding" to include situations where the UHCL reacts with calcium carbonate to create a suspension or liquid dispersion in water comprising UHCL.

## III. THE PTO ERRED IN FINDING CLAIM 1 OF THE '279 PATENT OBVIOUS OVER DILL IN VIEW OF ADMITTED PRIOR ART.

### A. Under the Correct Claim Interpretation, the PTO Erred in Finding Dill to be Analogous Art.

The first step in considering obviousness is to determine the scope and content of the prior art. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). The obviousness analysis recognizes that an inventor could not possibly be aware of every teaching in every art, thus knowledge is presumed only of prior art in the inventor's field of endeavor and in analogous arts. *In re Pagliaro*, 657 F.2d 1219, 1224 (C.C.P.A. 1981). The requirement that art be analogous serves the important purpose of removing from the obviousness analysis art which is "too remote" to be considered. *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992). The precursor court to the Federal Circuit cautioned against focusing on the scientific principle involved to determine whether art is analogous or too remote to be considered. *Pagliaro*, 657 F.2d at 1225. Instead, the subject matter should be considered as a whole. *Id.*

Art is analogous and may be considered in the obviousness analysis if it is within the applicant's field of endeavor. C*lay,* 966 F.2d at 658-59. The inventor's field of endeavor is defined by reference to the *claimed invention*. *In re Bigio,* 381 F.3d 1320, 1325-26 (Fed. Cir. 2004). Other art is analogous if the reference is reasonably pertinent to the particular problem with which the inventor is involved. *Clay*, 966 F.2d 658-59.

31

The PTO erred in determining that Dill is analogous art. The PTO erred in finding that the '279 patent is in the same "field of endeavor" as Dill and in finding that the inventors of the '279 patent and Dill directed their efforts toward the same problems. Moreover, the PTO's analysis should have been informed by this Court's analysis in *Clay*, a case with a fact pattern strikingly similar to the instant case. The PTO, however, despite receiving briefing on the similarities of the cases, entirely ignored *Clay*'s analysis. Thus, the Board erred in failing to consider *Clay*.

### 1. The PTO Erred in Finding Dill and the '279 Patent in the Same Field of Endeavor.

The PTO erred in finding the inventors "acknowledged" the invention was applicable to oil wells. The PTO conceded that "with respect to the field of endeavor, it is true that the bulk of the '279 Patent disclosure is about removing build-up of calcium carbonate from surfaces and industrial liquids," but then argues that the inventors purportedly recognized their invention was applicable to acidizing oil wells. That is incorrect.

The inventor's field of endeavor must be determined by reference to explanations of the ***invention's*** subject matter, including the embodiments, function, and structure of the ***claimed invention.*** *Bigio,* 381 F.3d at 1325-26. Findings on the scope of the field of endeavor must be adequately supported by the patent's written description ***and claims.*** *Id.* at 1326. The scope of the field of endeavor will vary with the factual description of each ***invention,*** and the PTO

must support its factual assessment of the field of endeavor with substantial evidence. *Id*.

The invention of the '279 patent is limited to a method to solubilize calcium carbonate in aqueous suspensions and dispersions of calcium carbonate, as recited in independent claim 1 and does not include other unclaimed, potential uses of UHCl that may be disclosed in the specification but that nowhere are described as the invention or as an embodiment of the invention. The specification describes the "invention" and various "embodiments" of the invention, all of which are related to removing build-up of water-insoluble salts, e.g. calcium carbonate, or lowering the solids content of industrial liquids. A0052 (1:55-67); A0053 (3:9-20, 3:40-44); A0053 – A0054 (4:66-5:4).

The '279 patent uses the terms "invention" or "embodiments" of the invention only to refer to methods of solubilizing suspensions or dispersions (i.e., cleaning methods):

> It is an object of the present <u>invention</u> to provide a method to remove the build-up of water-insoluble metal salts on surfaces.
> It is another object of the present <u>invention</u> to provide a method to lower the solids content of industrial liquids that contain water-insoluble metal salts.
> It is another object of the present <u>invention</u> to provide a method for the treatment of effluent from paper manufacturing and recycling processes.
> It is another object of this <u>invention</u> to provide a method for the removal of water-insoluble salt residue from masonry.

A0052 (1:55-67 (emphasis added)).

33

The <u>invention</u> as disclosed is, in one <u>embodiment</u>, a method to remove the build-up of water-insoluble metal salts on surfaces, and a method to lower the solids content of industrial liquids that contain water-insoluble metal salts using urea hydrochloride or its equivalent.  In a specific <u>embodiment</u>, a method is provided to adjust the pH of textile treatment baths, effluent streams, and processing water, including effluent from paper manufacturing and recycling, using urea hydrochloride or its equivalent.

A0053 (3:9-20 (emphasis added)).

In a preferred <u>embodiment</u>, urea hydrochloride or its equivalent disclosed herein is used to solubilize water insoluble metal salts, such as carbonates, for example, those with calcium, barium, aluminum, strontium, beryllium, and magnesium counterions.

A0053 (3:40-44 (emphasis added)).

In an alternative <u>embodiment</u>, a salt formed by the combination of a strong acid with a weak base other than urea hydrochloride is used to remove the build-up of water insoluble metal salts on surfaces, and to lower the insoluble solids content of industrial liquids that contain water insoluble metal salts.

A0053 – A0054 (4:66-5:4 (emphasis added)).

The PTO points to the specification at col. 3, lines 21-48 and argues it means the invention is applicable to oil wells.  The cited passage merely discloses alternative potential uses for urea-HCl (a chemical known for some time prior to the '279 patent), and in contrast to other disclosure in the spec, fails to use the words "invention" or "embodiment" of the invention:

Urea hydrochloride, as well as the equivalent strong acid/weak base salts disclosed herein, can also be used as an acid replacement in any process that hydrochloric acid (also referred to as muriatic acid) has traditionally been used in, including but not limited to acidizing (activation) of petroleum wells, boiler scale removal, ore reduction,

> food processing (e.g., corn syrup and sodium glutamate), pickling and metal cleaning, industrial acidizing, general cleaning (e.g., of membrane in desalination plants), alcohol denaturizing, production of vinyl chloride from acetylene and alkyl chlorides from olefins, hydrochlorination, polymerization reactions, isomerization, alkylation, and nitration reactions. Urea hydrochloride can replace traditional acids for solvation, in aqueous cleaning solutions, and in other processing solutions. Materials that can be cleaned include wire, metals, jewelry, printed circuit boards, wood, masonry, mortar, concrete, painted surfaces, plastics, polymeric substances, and the like.

A0053 (3:21-48).

The PTO states the above quoted language "cannot be ignored." A0016. That is error. Controlling precedent clearly requires the field to be determined by reference to the invention. The quoted language is broader than the invention and is thus broader than the inventor's field of endeavor. To interpret the field of endeavor to include every possible method where HCL might be used sweeps in an enormous amount of prior art that is not truly analogous and places an enormous burden on an inventor to have knowledge of a wide variety of disparate art.

The patent law recognizes that "an inventor could not possibly be aware of every teaching in every art" and thus attempts to "closely approximate the reality of the circumstances . . . by only presuming knowledge by the inventor of prior art in the field of his endeavor and in analogous arts." *In re Wood*, 599 F.2d 1032, 1036 (C.C.P.A. 1979). The overbroad field asserted by the PTO presumes knowledge by the inventors of art well outside their field of endeavor, fails to

approximate the reality of the circumstances, and fails to serve the important purpose of removing from the obviousness analysis art which is "too remote" to be considered. *Clay*, 966 F.2d at 658.

### 2. The PTO Erred by Ignoring *In re Clay*.

This Court previously has held that references "cannot be considered to be within [the same] field of endeavor merely because both relate to the [same] industry." *Id.* at 659. The fact pattern in *Clay* is almost a mirror image of the present case.

Clay's invention was a process for storing refined liquid hydrocarbons that utilized a gel to fill dead volumes in the tank to reduce loss of the stored hydrocarbons. *Id.* at 657. The prior art disclosed a process using a similar gel for use in subterranean formations to fill void spaces and increase production of oil. *Id.* at 658. The Federal Circuit held the BPAI erred in relying on the prior art because it was not analogous. First, the prior art was not in the same field of endeavor: (1) the prior art taught use of a gel within ***underground, natural, oil-bearing formations***, and Clay taught use of a gel in a ***man-made*** storage tank; (2) the prior art operated in ***extreme conditions***, and Clay operated at ***ambient conditions***. *Id.* at 659. Thus, while the Board characterized the field of endeavor of both Clay and the prior art broadly as "maximizing withdrawal of petroleum stored in petroleum reservoirs," the Federal Circuit held the prior art field of

endeavor was "***extraction*** of crude petroleum," and the field of Clay was "***storage*** of refined liquid hydrocarbons." *Id.* (emphasis in original).

Here, as in *Clay*, the prior art and patent at issue respectively teach use in "generally underground natural oil-bearing formations" vs. "man-made" surfaces and operation in "extreme conditions" vs. "operat[ion] at ambient temperature and atmospheric pressure." *Id.* Indeed, while the PTO stated that "claim 1 is not limited to specific set of conditions or processes," the same was true of the claims at issue in *Clay*. *Id.* at 657-58. This Court, however, inferred ambient conditions into claims at issue in *Clay* and should do the same here where the entirety of the specification including the examples evidences an intention for the invention to be used in ambient conditions. *See id.* at 659.

Here, the prior art functions within underground natural oil-bearing formations at extreme conditions, just as in *Clay*, and the claims at issue related to a method used in man-made equipment at ambient conditions, just as in *Clay*. Accordingly, just as in *Clay*, this Court should find that the prior art is in a different field of art from the invention, and is thus non-analogous.

### 3. The PTO Erred by Finding Dill and the '279 Patent Related to the Same Problem.

The PTO erred by relying heavily on a scientific principle to determine that Dill is analogous art. Dill was not, as the Board said at page 14 "concerned with removing or dissolving calcium carbonate," but instead "concerned with acidizing

or fracturing a subterranean formation to obtain gas or oils," consistent with the Board's finding at page 15. A3271 (1:9-17). This distinction is critical because it demonstrates that the PTO improperly focused on a scientific principle and ignored the true substance of Dill.

If prior art is not in the field of endeavor of the invention, it still may be analogous if it is reasonably pertinent to the same problem addressed by the inventor. The problem addressed by the '279 patent is preventing adverse effects on man-made systems caused by suspensions and dispersions of calcium carbonate and doing so in a way that does not itself damage the man-made systems. A0052 (1:24-44, 1:55-67). Dill is not reasonably pertinent to that problem because Dill deals with an entirely different problem and because the structure and function of the technology disclosed in Dill is significantly different from that of the '279 patent.

The PTO erred in finding that Dill describes dissolving "calcareous rock . . . which comprises calcium carbonate." Calcareous, however, only means calcium containing: "made up of, having or typical of calcium carbonate, *calcium* or limestone." A2381. Thus, the calcareous rock of Dill may be calcium containing materials *other than* calcium carbonate. That is supported by Dill's teaching that the reaction rate depends on the *type* of reactive material involved, indicating that

there is more than one reactive material.  A3271 (1:32).  The PTO's reliance on Dill's disclosure of dissolving calcareous rock thus is misplaced.

The PTO also erroneously found that Dill and the '279 patent address the same problem of corrosion and harmful gas associated with the use of hydrochloric acid.  Admittedly, the difference here is one only of scope, but that difference is critical.  Dill says that "the release of corrosive fumes as the acid is injected down the well bore" is a problem, and that the fumes can cause corrosion to equipment and irritation to personnel at the surface.  A3271.  But a solution suitable for use in a wellbore environment is not necessarily suitable for the environment in which the inventors of the '279 patent were operating.  That is, there is no teaching in Dill or any other art of record that a solution that would prevent corrosive fumes from wafting the length of a wellbore in a concentration sufficient to cause corrosion and irritation *at the surface*, far removed from where the acid is being used, is likely to be sufficient to make safe an acid that is used in close proximity to, or handled directly by, the relevant personnel.  The '279 patent describes situations where the personnel carrying out the claimed method is spraying the acid or pouring it into a vessel.  A0054 – A0055 (6:62-7:10).  The problems addressed by Dill and by the '279 patent thus are different at least because they exist in very different environments.

The Board also relied on the paragraph in the '279 patent where the inventors speculate regarding other uses for their UHCL that are outside the scope of the claimed invention. As explained above, that reliance was error.

Moreover, the Board erred multiple times in explaining why it found Dr. Tolbert's testimony unpersuasive. The Board repeated its erroneous finding that "calcareous" necessarily includes calcium carbonate. In addition, the Board found Dr. Tolbert "admitted that limestone contains calcium carbonate" when he did so such thing. Dr. Tolbert actually said that "limestone" may be used to refer to magnesium carbonate. A2586 – A2587 (¶ 9). Dr. Tolbert concluded that "limestone is not chemically or physically equivalent to calcium carbonate particles in suspension or dispersion" – quite the opposite of what the Board found. A2587 (¶ 9).

The Board further found that "Dr. Tolbert simply has not offered an explanation" for "how pores and transformation would occur without *dissolving* calcium carbonate." That is untrue. Dr. Tolbert explained that Dill describes reacting only small portions of a formation, leaving the majority unreacted and intact. A2588 (¶ 11). Dr. Tolbert further explained that some of the acids disclosed in Dill, notably hydrofluoric, would not *solubilize* calcium carbonate, but would create a new water *insoluble* salt, e.g., calcium fluoride. A2588 – A2589 (¶ 12). Dr. Tolbert argued that disclosure thus "supports reading Dill as describing

40

the restructuring of a material, *not* the rendering of a water-insoluble material water-soluble." A2588 (¶ 12).

The "restructuring" thus, is the conversion of one water-insoluble salt to another water-insoluble salt, which reaction would result in slight changes to the physical structure of the formation, and those slight changes are all that is required to increase porosity. The gelled acid functions as a chemical bulldozer moving small amounts of subterranean rock aside to facilitate fractures. Thus, Dr. Tolbert did offer an explanation for how pores and transformation would occur without *dissolving* calcium carbonate.

The Board's analysis is riddled with errors. Dill's objective was "extend the reaction time of acidizing fluids." A3271 (1:43-44). In contrast to the '279 patent, Dill teaches increasing the permeability of underground formations by effecting removal of a general class of "calcareous rock." A3271 (1:16-17, 1:29-32); A3272 (3:30-32). Dill's process is destructive and creates and etches fractures. A3271 (1:25-28). Dill's process is carried out under pressure and urea is used to stabilize a selected thickening agent. A3271 (1:37-41,1:47-55). Stabilizing the gelled acid is highlighted in the Abstract and is discussed extensively in the specification. A3270 (Abstract); A3271 (1:65-3:7); A3273 (5:1-6:2). Indeed, every independent claim of Dill recites urea "in an amount sufficient to extend the viscous stability" of the gelled acid composition in comparison to the viscous stability of a gelled

41

acid comprising the selected acid and gelling agent alone. A3274 (Claims 1, 7, and 13).

None of these teachings of Dill would have been of interest to an inventor concerned with removing suspensions and dispersions of calcium carbonate from industrial systems while protecting the relevant equipment. Accordingly, Dill is not analogous art to the '279 patent.

Dill describes suitable acids as hydrochloric, hydrofluoric, formic, and acetic. A3271 (1:67-2:2). The person skilled in the art immediately would know that two of those acids would fail to solve the problem of solubilizing suspensions and dispersions of calcium carbonate because they would form new water-insoluble calcium salts. A2588 – A2589 (¶ 12). Thus, Dill is not reasonably pertinent to the problem the inventors set out to solve.

Finally, Dill does not disclose, discuss, or otherwise address suspensions or dispersions of calcium carbonate. By contrast, Dill is related to dense, underground rocks of uncertain and undefined chemical composition. In examples, Dill uses a dense, crystalline form of calcium carbonate to approximate the dense, underground formations, Icelandic spar. A3272. Not only is this form of calcium carbonate not a suspension or dispersion, but the high temperature and pressure conditions inherent in all the methods described in Dill, and specifically described in the examples, are significantly different from the ambient conditions

with which the '279 patent's inventors were concerned. A2589 – A2590 (¶ 13). Based on the forgoing, the methods of Dill are carried out in an environment that is not structurally similar to, does not operate under the same conditions as, and does not function like the environment where the invention of the '279 patent is practiced.

Again *Clay* should have informed the PTO's analysis. In *Clay* this Court found the natural subterranean formation where the prior art process was carried out was not structurally similar to, did not operate under the same conditions as, and did not function like the above ground, man-made storage tanks where Clay's invention was practiced. *Clay*, 966 F.2d at 659-60. This Court plainly held that "the problem of recovering oil from rock" in subterranean formations, i.e. Dill's purpose, was "not reasonably pertinent" to an invention relating to treating man-made objects. *Id.*

Indeed, this Court even held that failing to operate at "the same temperature and pressure" and failing to have "structura[l] similarity" were factors that pointed to the cited art not being reasonably pertinent. *Id.* Appellant cannot imagine a more directly relevant case than *Clay*. The claimed method does not take place under "the same temperature and pressure" as Dill nor does it deal with an environment "structurally similar" to the subterranean formations in Dill. *In Re Clay* almost plainly directs a court to find in favor of Appellants, but the Board

43

ignored the factual circumstances and analysis of *Clay*. *Clay* is precisely on point and should have been given significant weight.

Accordingly, the PTO's analysis was seriously flawed and its finding that Dill is analogous art was erroneous.

**B.    The Differences in Dill and the Claimed Invention are too Great for Dill to Make the Claims Obvious.**

If the discussion above does not make clear that Dill is non-analogous art, it at least demonstrates that any *prima facie* case of obviousness is weak.

**C.    Under the Correct Interpretation, The Board Erred in Finding there is No Nexus between Appellant's Secondary Indicia of Non-Obviousness and the Claimed Invention.**

The PTO's use of an incorrect claim interpretation caused it to err in finding no nexus between Appellant's secondary indicia of non-obviousness and the claimed invention.

**1.    The Board Narrowed Applicant's Evidence of Secondary Considerations Based on Incorrect Claim Scope.**

The Board erred by using an incorrect claim interpretation and thereby failing to consider the full scope of Appellant evidence of secondary considerations.

During the reexamination, Appellant's submitted evidence of commercial success of the claimed invention, copying of the claimed invention, and praise in the industry for the claimed invention. Appellant submitted evidence related to products containing UHCL, where the UHCL in the products is used to solubilize

44

aqueous suspensions of calcium carbonate and solid dispersions of calcium carbonate in the form of deposits of concrete and scale. The Board looked for a nexus, but found that "removing concrete and scales from equipment with urea hydrochloride . . . [are] ***uses that we have determined not to be within the scope of the claim***." Consequently, while "some of the uses [of the products are] covered by claim 1, [Appellant] did not establish what part of the 64 million pounds of urea hydrochloride that was sold went to the uses covered by the claims." A0024.

As explained in detail above, under the correct interpretation, solid dispersions are within the scope of the claim, both because the plain meaning of dispersions includes solid dispersions and also because when UHCL is added to a solid dispersion it creates an aqueous suspension that reacts with the UHCL. Accordingly, because it used incorrect claim constructions for the terms "dispersions" and "adding," the PTO erred by failing to consider the full scope of Appellant's evidence.

The Board's error permeates throughout its analysis of Appellant's evidence of secondary considerations. First, the incorrect claim construction causes the Board to question what part of the sales went to uses covered by the claims, when ***all*** of the sales went to uses covered by the claims. Second, the incorrect claim construction creates uncertainty in the level of success by omitting from consideration the testimony by Roger Dexter that Appellant's customer/distributor

45

Crews Chemicals "experienced a very rapid growth with Appellants UHCL product." A2518 (¶ 7). In an industry where "[t]ypically it takes about a year for a customer to try a new product, test it, make the business decision to implement it, and finally actually implement the products . . . [w]ithin 2 years sales topped 1 million pounds." A2517 – A2518 (¶ 7). Regarding this testimony, the PTO merely stated "the rapid growth in sales of urea hydrochloride reported by Mr. Dexter was to clean scales from equipment, not the claimed method." A0024.

Mr. Dexter also testified that Crews Chemical gained a "major advantage over competitors" by having an exclusive contract with Appellant to sell its UHCL product for use in the pulp and paper industry and the efficiency and safety of the product were a huge benefit to Crews Chemical customers. A2517 (¶ 6). This evidence was either not considered or given very little weight based on the PTO's incorrect claim constructions.

The PTO also erred in considering Appellant's evidence of praise in the industry for the claimed invention by using its incorrect claim construction. Specifically, Appellant presented evidence that certain products the use of which practice the claimed method received the "Most Innovative Product" award from Concrete Producer Magazine. A3012 (¶ 15). The Board, however, gave the evidence "little weight" in part because "the nexus, if any" was weak. The products were used on solid dispersions of calcium carbonate and the Board found

"urea hydrochloride is added only in the first step. There is no subsequent step as recited in claim 1 of 'adding' urea hydrochloride to a dispersion or suspension of calcium carbonate." Under the correct construction of "dispersion," however, the claim covers adding urea hydrochloride to a solid dispersion, thus the ***first*** addition of UHCL is sufficient to accomplish adding. Moreover, under the correct construction of "adding," adding is accomplished by adding the UHCL to a solid dispersion and creating an aqueous suspension. Either way, based on its incorrect claim construction the Board erred in finding no nexus.

### 2. Appellant's Evidence of Secondary Considerations Outweighs any *Prima Facie* Case of Obviousness.

Even if the PTAB did not err in finding a *prima facie* case of obviousness, the overwhelming evidence of secondary considerations in this case leaves no doubt that the claimed method was not obvious. If evidence of secondary considerations is properly presented, the evidence must be considered in connection with the determination of obviousness. *In re Sernaker*, 702 F.2d 989, 996 (Fed. Cir. 1983). Moreover, "[o]bjective indicia of nonobviousness, when present, must always be considered *before* a legal conclusion under § 103 is reached." *Jones v. Hardy*, 727 F.2d 1524, 1530 (Fed. Cir. 1984).

Appellant's evidence of secondary considerations is based in part on two products sold by Appellant, Novoc ACL ("Novoc") and Acrymal S-1400 ("Acrymal") ("Appellant's urea hydrochloride products"), and several products

47

sold by Appellant's former customer Environmental Manufacturing Solutions, Ready Mix Truck Wash and Wax ("Ready Mix" or "RMTWW"), Barracuda, Basic CR, and BlowOut (the "EMS urea hydrochloride products"), which incorporated Appellant's Novoc or Acrymal. Collectively the products are referred to as "the urea hydrochloride products." Each of the UHCL products was advertised, sold, and used for carrying out the method claimed in the '279 patent. Those products (A) have enjoyed commercial success; (B) have been copied by others; and (C) have received praise in the industry. Such evidence is more than sufficient to overcome any allegation of obviousness

Appellant's UHCL products are sold as concentrated solutions of UHCL in water. A2614 (¶ 5). The products contain a small percentage of additives, but UHCL is the only ingredient active for solubilizing calcium carbonate. A3010 (¶ 8.) The UHCL is in a molar ratio of 1:1. A3010 (¶ 8). The EMS UHCL products also are solutions of UHCL in water, and during the relevant time the UHCL was sourced from Appellant as Novoc or Acrymal, so it was in a 1:1 molar ratio. A3012 (¶ 15); A3025 (¶ 5).

The Board found that some uses of the products are covered by claim 1, excluding only uses on solid dispersions. A0024. The Board also found that Appellant's had demonstrated that the EMS products contain UHCL. A0027. The Board further found that Appellant provided adequate evidence that applying a

48

solution of UHCL to a solid deposit of calcium carbonate would result in creating of a suspension of calcium carbonate. A0010.

a.  *Appellant has Demonstrated a Nexus between the Claims and ALL of its Evidence of Secondary Considerations.*

The Board conceded that there was a nexus between some of Appellant's evidence and the claims, presumably because the products can be used in methods of solubilizing aqueous suspensions of calcium carbonate. A0024. The only reason the Board found no nexus between the remainder of the evidence and the claims is because the products were used in method of solubilizing solid dispersions of calcium carbonate. A0023. Under the correct construction, however, those uses would be covered by the claims. Thus, under the correct construction of claim 1, all of Appellant's evidence has the proper nexus.

There is a nexus between the commercial success, copying, and praise of the UHCL products and the invention claimed in the 279 patent at least because, as described above, UHCL is the only ingredient in the products active for solubilizing calcium carbonate, A3010 (¶ 8); A3012 (¶ 15); A2668 (lines 19-22 (EMS products were formulated with Appellant's UHCL from 2005 to 2008)), the UHCL is in a molar ratio of about 1:1, A3010 (¶ 8); A3064 (¶ 24-25), and the products are marked and used for carrying out the claimed method, including solubilizing calcium carbonate in aqueous suspensions A2587 – A2588 (¶ 10); A2601 – A2602; A2614 – A2615 (¶ 6-7); A3026 (¶ 10-13).

For example, the UHCL products primarily are used in two methods, cleaning concrete (generally off of concrete trucks, but also from other surfaces) and cleaning calcium carbonate scale from boilers, lines, and other surfaces where scale deposits. A3012 (¶ 15); A3025 (¶ 5); A3026 (¶ 10-13). These methods involve repeated or continuous application of the UHCL products to the concrete or scale. For example, a concrete truck is washed the way any other vehicle is washed – the cleaning solution is applied and the truck is brushed or scrubbed during application of the cleaning solution or alternating with multiple applications. A3026 (¶ 10). Boilers and lines are cleaned by flushing with the cleaning solution. A3026 (¶ 11). Both the concrete and scale are solid dispersions of calcium carbonate.

Product literature for some of the products indicates how they are marketed and how they are intended to be used. For example: RMTWW "removes concrete" and is a "non-corrosive, non-skin irritant and biodegradable truck wash." A3029. Barracuda "removes concrete," is "non-corrosive," and is "safe on skin." A3034. A user "can apply [Barracuda] to any kind of equipment," and it is "ideal for cleaning [concrete] forms, pavers, portable mixers . . . anywhere you find cement, gunite, or mortar." A3034. Basic CR "removes concrete," is "non-corrosive" and is "safe on skin." It is "ideal for concrete cleanup, . . . masonry cleaning . . . ." A3041. BlowOut "dissolves calcium," is "the most aggressive line

cleaner and descaler ever developed," and "can be used to safely descale cooling towers, heating coils, boilers, and any equipment that tends to build up calcium . . . ." A3046. The literature for each of those products touts its "calcium carbonate dissolving properties" and each is used on calcium carbonate that when exposed to the products forms an aqueous suspension as described above. A3029; A3034; A3041; A3046. As explained in detail above, applying the dilute aqueous solution of UHCL to concrete or boiler scale creates an aqueous suspension of calcium carbonate and dissolution of that suspension with the product is consistent with the claims.

The products also are marketed by demonstrating the features claimed in the '279 patent – the ability of UHCL in a molar ratio of 1:4-4:1 to solubilize calcium carbonate in aqueous suspensions or in dispersions. A3011 (¶ 12-13); A2614 (¶ 6). The demonstrations by Appellant and the use by Crews Chemical include solubilizing calcium carbonate in dispersions and in aqueous suspensions.

One demonstration, putting concrete into a solution of UHCL, is performed at ambient temperature and pressure, and sufficient water is present in the product to allow the carbon dioxide to effervesce and to dislodge and suspend small pieces of calcium carbonate in the liquid water. A2614 (¶ 5-6). Thus, in addition to showing solubilization of a solid dispersion of calcium carbonate by UHCL, the demonstration shows solubilization of calcium carbonate in aqueous suspensions.

The same applies to the use of the UHCL products sold by Crews Chemical, i.e., the presence of water and the reaction conditions result in suspension of dislodged calcium carbonate.  A2671 (¶ 4).

> b.  *Products Used to Practice the Method Claimed in the '279 Patent have Enjoyed Commercial Success.*
>
> > i.  Legal Requirements for a finding of Commercial Success.

Courts have considered the following relevant to and probative of commercial success:  sales of patent applicant/owner's products covered by the patent, *J.T. Eaton & Co., v. Atlantic Paste & Glue Co.*, 106 F.3d 1563, 1566 (Fed. Cir. 1997); increase in patent owner's sales and increase in share of patent owner's business attributable to patented invention, *Neupak, Inc. v. Ideal Mfg. & Sales Corp.*, 41 F. App'x. 435, 440 (Fed. Cir. 2002);   sales of infringing products, *Gambro Lundia AB v. Baxter Health Care Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997);   evidence of share in the market place, growth in market share, and replacing earlier units sold by others, *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed. Cir. 1983); whether profitability per unit is anything out of the ordinary in the industry involved, *Cable Elec. Prods. Inc. v. Genmark, Inc.,* 770 F.2d 1015, 1027 (Fed. Cir. 1985), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356 (Fed. Cir. 1999); and evidence that the

applicant has been able to license the invention and that licensees have been able to sell product. *Sernaker*, 702 F.2d at 996.

Several courts have noted that commercial success sometimes can be established by ***sales evidence alone***, including the fact that patent holders sales have increased significantly and/or based on gross sales and annual sales. *Neupak*, 41 Fed. Appx. at 440 (finding commercial success based on increasing sales and increasing share of patent owner's own business without evidence of market share); *Eaton*, 106 F.3d at 1566 (finding commercial success based on gross sales from 1979 through 1984 and annual sales from 1985 through 1989).

> ii. Appellant has Demonstrated a Nexus between the Commercial Success and the Claimed Invention.

As noted above the Board's erroneous claim construction caused it to question what part of the sales went to uses covered by the claims, when ***all*** of the sales went to uses covered by the claims. While Appellant has no control over how its product is used by end users, it is highly likely that all, or substantially all, of Appellant's product was purchased and used for uses claimed in the '279 patent, as described below.

Appellant's business model is to create technology to solve problems of potential customers, manufacture the underlying technology, and sell the products through distributors that service particular industries. A2616 (¶ 9). Because of that business model, Appellant can be fairly confident of where its products are

sold and how they are being used. Appellant has sold or sells its UHCL products through distributors such as Vitech, Rochester Midland, Hercules, Crews Chemical, EMS, Power Kleen, and Arrow Magnolia. A2616 (¶ 9). Those distributors service the Household, Industrial, and Institutional (HI&I) market, the paper industry, the concrete industry, and the marine market and sell products containing UHCL for removing calcium carbonate suspensions and dispersions in the form of deposits on household and industrial surfaces, from paper process streams and equipment, in the form of wet or dry concrete, and in the form of scale. A2616 (¶ 9). While it is possible that a small fraction of Appellant's products are used for purposes other than those recited in the '279 patent claims, the products are sold into particular industries for the particular purposes recited in the '279 patent and it is highly likely that all of the products are actually used for those purposes. Appellant is not aware of any of its products being used the other methods identified by the Office. A2617 (¶ 10).

Moreover, as explained in more detail below, Appellant's UHCL is sold at a higher price than the price of UHCL available from other sources. If Appellant's customers were purchasing Appellant's UHCL products for purposes other than those claimed in the '279 patent, they could do so for less than half the cost by purchasing from another supplier, so it is highly unlikely that customers who

purchase Appellant's products use them for purposes other than those claimed in the '279 patent.

Accordingly, it is highly likely that all, or nearly all, of the sales of the UHCL can be attributed to the claimed method.

        iii.    Appellant's Sales Data Demonstrate Commercial Success.

Appellant's UHCL products have enjoyed substantial commercial success. Indeed, the Board conceded that Appellant ***"establish[ed] that the product was*** ***successful."*** A0025. As explained above, the PTO's use of an incorrect claim interpretation created uncertainty in the level of success by omitting certain testimony from the analysis.

Appellant has sold over 64,000,000 pounds of UHCL containing products since the '279 patent issued. A3012 (¶ 16). Those products are highly concentrated formulations that are diluted by distributors before resale. A3012 (¶16). Thus, the actual amount of Appellant's UHCL products sold to end users is substantially greater than 64,000,000 pounds. A3012 (¶ 16). Moreover, sales of Appellant's UHCL-containing products increased substantially and dramatically in the years just after the patent issued is evidence of commercial success. A3012 (¶ 16).

Appellant's distributor Crews Chemicals also saw unexpectedly fast acceptance of its UHCL products, selling more than 1 million pounds in the first

two years, in an industry where typical time to analyze and implement a new product is about a year. A2517 – 2518 (¶ 4-7). Crews Chemical's access to Appellant's UHCL gave it a "major advantage over competitors." A2517 (¶ 6). The PTO has not provided any persuasive basis to question Mr. Dexter's testimony. *See In re Soni*, 54 F.3d 746, 751 (Fed. Cir. 1995).

Appellant's evidence of significant sales, combined with the dramatic increase in sales in the years just after the patent issued, is evidence of commercial success. The fact that one of Appellant's distributors also saw unexpectedly fast acceptance of the urea-HCl products it sold for Appellant is further evidence of commercial success. A2517 – 2518 (¶ 4-7).

The PTO questioned whether the safety and efficacy of the products are responsible for the commercial success and suggested that, if so, the commercial success is related to benefits that were known in the art. That is incorrect. As explained above, any safety and efficacy taught by the cited prior art is safety and efficacy only in the very specific environment of an underground formation. The safety and efficacy that makes the UHCL products successful is the ability for a user to touch, even immerse a finger in, the UHCL even as the UHCL dissolves calcium carbonate. That safety and efficacy is important in the context of the invention claimed in the '279 patent because personnel using products according to the claimed method are in close proximity to the products and reasonably might be

splashed with the product.  That degree of safety and efficacy in the same product is not taught or suggested by the prior art.  Rather, the prior art teaches only that a similar composition additionally including a gel used deep underground addresses the problem of fuming and corrosion at the earth's surface.  Dill does not teach or suggest, and one of skill in the art reading Dill is unlikely to assume, that a person could safely place a finger in the gelled acid composition that is used to chemically bore through a subterranean formation.  Thus, to the extent the safety and efficacy of the products are responsible for the commercial success, that safety and efficacy most definitely is not taught or suggested by the prior art.

The PTO also argues that Appellant has not provided sufficient support for the argument that commercial success is demonstrated by customer/distributor's willingness to pay 150 times as much for Appellant's UHCL for use in the claimed method than they would have had to pay for its components.  Appellant, however, has provided support for that argument and the PTO has not provided any persuasive basis to question Appellant's evidence or conclusion.  *See Soni*, 54 F.3d at 751.

The chemical composition UHCL is not patented or proprietary in any way and is easily made by combining urea and hydrochloric acid, both of which are commodity chemicals.  A2615 (¶ 8 UHCL is "easily made from urea and hydrochloric acid, both of which are commodity chemicals."); A2590 (¶ 14 ("the

combination of urea and hydrochloric acid to form urea hydrochloride is . . . a trivial preparation.")).   It is important to note that Appellant does not sell products to end users or to average consumers.  Rather Appellant sells specialty chemicals to companies that incorporate those specialty chemicals into their own products. A2616 (¶ 9); A2662 (lines 7-11 (Appellant sold to Vitech, and Vitech combined Appellant's product with other chemicals to make their products.)).   Thus, the customers purchasing Appellant's UHCL products are completely capable of and equipped to blend their own UHCL from the commodity chemicals urea and hydrochloric acid.  They do not do so, however, when they are using the UHCL for the patented methods.

On the open market from 2005 to 2008 urea was sold for between $0.170 and $0.325 (average $0.215) per pound and hydrochloric acid for between $0.075 and $0.085 (average $0.081) per pound.   A2654; 2652 (lines 5-8).   Thus, by purchasing those commodity chemicals, Appellant's chemical company customers easily could manufacture UHCL for about $0.148 per pound ($1.487 per gallon). 2615 (¶ 8); A2590 (¶ 14); A2654.  Over that same period, however, Appellant sold its UHCL for an average of $3.662 per pound – an average incremental profit of $2.13, or nearly 150 percent.  A2654; A2653 (lines 15-18); A2615 – A2616 (¶ 8). That profit is representative of the profit Appellant has maintained since it introduced its products, and is representative of the higher value that Appellant's

method of use introduced to the UHCL market, which is evident from consumers' willingness to pay a higher price for UHCL that is used in claimed method as compared to UHCL obtained for uses other than those claimed in the '279 patent. A2615 – A2616 (¶ 8); A2662 – A2663 (lines 34-5 (the sales price includes the price of an implied license to use the method of the '279 patent)).

Moreover, Appellant's UHCL products are replacements for hydrochloric acid for solubilizing suspensions and dispersions of calcium carbonate, but Appellant's product is significantly more expensive than hydrochloric acid. A0052 (1:34-39 (describing prior art use of HCL), 2:21-25 (UHCL has advantages over "conventional methods using hydrochloric acid"); A3041 ("direct replacement for Muriatic [hydrochloric] acid blends"). Appellant's demonstrated ability to sell its UHCL products for use in the patented method at a price higher than market prices for UHCL sold for other uses and significant sales even though its product replaced a much cheaper product are evidence of commercial success and demonstrate the non-obviousness of the invention.

### c. *Appellant's Invention has been Copied by Others.*

The Board did not challenge Appellant's evidence that the invention has been copied, rather the Board agreed that "sufficient evidence was presented [to demonstrate] the EMS product contains UHCL." A0026.

59

UHCL products have been copied by others in the industry including at least

Rochester Midland and Environmental Manufacturing Solutions (EMS). A3011 –

A3012 (¶ 14-15). EMS was a one-time purchaser of Appellant's urea-

hydrochloride products which it incorporated into its own products for solubilizing

calcium carbonate in aqueous suspensions and dispersions, then EMS stopped

purchasing and started manufacturing its own UHCL. A3012 (¶ 15); A2668 (lines

19-22 (EMS products were formulated with Appellant's UHCL from 2005 to

2008)). EMS's UHCL was substantially similar to Peach State's UHCL and was

used for the same purposes. A3025 (¶ 5 (EMS products contained UHCL as of

January 2010)); A2668 (lines 19-22). Access and substantial similarity to a

patented product is evidence of copying. *Cable Elec.*, 770 F.2d at 1027.

> d. *Appellant's Invention has Received Praise in the Industry.*

During the time that EMS's RMTWW, Barracuda, and Basic CR products

were formulated with Appellant's UHCL, the products (and by UHCL, as the

active ingredient) received praise in the industry as evidenced by the 2006 Most

Innovative Product Award. A3012 (¶ 15); A3025 (¶ 5); A3029 ("Powered by

SynTech®," "recommend[ed by] industry giants," "2006 Winner Most Innovative

Products"), A3034 ("patented SynTech®," "recommended by leaders in the

cement industry," "2006 Winner Most Innovative Products"), A3041 (same),

A3063 (¶ 4-5) (SynTech is urea hydrochloride); A2668 (lines 19-22 (when the

60

products won awards they were formulated with Appellant's UHCL)).   The

product has no use other than to practice the claimed invention.   A3025 (¶ 5);

A3026 (¶ 10-11 ("the products are used to remove solid deposits of concrete and

scale)); A3029 – A3030 (the product works by solubilizing deposits of calcium

carbonate); A3034 – A3035 (same); A3041 – A3042 (same); A3046 – A0047

(same)).   The forgoing demonstrates praise in the industry and a nexus between the

praise and the claimed invention.   Praise in the industry is evidence of commercial

success.

## CONCLUSION

Appellant requests this Court adopt Appellant's claim constructions and

reverse the PTO's determination of obviousness.

Dated:  June 17, 2014                    Respectfully submitted,

                                         /S/JENNIFER L. BLACKBURN
                                         MITCHELL G. STOCKWELL
                                         D. CLAY HOLLOWAY
                                         JENNIFER L. BLACKBURN
                                         KILPATRICK TOWNSEND & STOCKTON LLP
                                         1100 Peachtree Street NE, Suite 2800
                                         Atlanta, GA 30309
                                         (404) 815-6500

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing document with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served a copy on counsel of record, this 17th day of June, 2014, by the CM/ECF system and electronic mail.

/s/ Jennifer L. Blackburn
MITCHELL G. STOCKWELL
D. CLAY HOLLOWAY
JENNIFER L. BLACKBURN
KILPATRICK TOWNSEND & STOCKTON LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309
(404) 815-6500

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B). Exclusive of the portion exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), this brief contains 13,889 words as counted by the word-processing system used to prepare the brief.

/s/Jennifer L. Blackburn
Jennifer L. Blackburn

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

**ITEM**                                                                                              **PAGE**

Decision on Appeal of the Patent Trial and Appeal Board,
United States Patent and Trademark Office for *Ex Parte*
Reexamination Control No. 90/011,628, Appeal No. 2013-
008300, entered on November 18, 2013 ..................................................... A1 – A30

Certified List ........................................................................................ A31 – A34

U.S. Patent No. 5,672,279......................................................................... A51 – A55

Listing of Claims.......................................................................................... A35



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/011,628 | 05/09/2011 | R. Richard Sargent | P2160-804896 | 3103 |

23370          7590          11/18/2013
KILPATRICK TOWNSEND & STOCKTON LLP
1100 PEACHTREE STREET
SUITE 2800
ATLANTA, GA 30309

| EXAMINER |
|---|
| HUANG, EVELYN MEI |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3991 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/18/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

A1

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

PEACH STATE LABS, INC.
Patent Owner and Appellant
_____

Appeal 2013-008300
Reexamination Control 90/011,628
Patent U.S. 5,672,279
Technology Center 3900
_____

Before RICHARD M. LEBOVITZ, JEFFREY B. ROBERTSON, and
RAE LYNN P. GUEST, *Administrative Patent Judges*.

LEBOVITZ, *Administrative Patent Judge*.

DECISION ON APPEAL

Patent Owner, Peach State Labs, Inc., appeals from the Patent
Examiner's rejections of claims 1-5 in the above-identified *ex parte*
reexamination proceeding of US 5,672,279.  The Board's jurisdiction for
this appeal is under 35 U.S.C. §§ 6(b), 134(b), and 306.  We affirm.

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

## I. STATEMENT OF CASE

This appeal involves US 5,672,279 ("the '279 Patent") which issued September 30, 1997. Under 35 U.S.C. § 301-307 and 37 C.F.R. § 1.510, a Corrected Request for *Ex Parte* Reexamination of the '279 Patent was submitted by third-party requester, Environmental Manufacturing Solutions, LLC ("EMS") on May 9, 2011. Reexamination of the '279 Patent was subsequently ordered (Order Granting Request for Reexamination, June 29, 2011). An oral hearing was held September 18, 2013. A transcript will be entered into the record in due course.

The real party in interest in this *ex parte* reexamination proceeding is the Patent Owner, Peach State Labs, Inc. (Appeal Br. 1, dated December 26, 2012). Patent Owner states that the '279 Patent was the subject of *Peach State Labs, Inc. v. Environmental Manufacturing Solutions, LLC*, Case No.4:08-CV-190-HLM, previously pending in the U.S. District Court for the Northern District of Georgia, Rome Division and that the case was dismissed without prejudice on July 6, 2009 (*id.*) Patent Owner also states that the '279 Patent is the subject of *Peach State Labs, Inc. v. Environmental Manufacturing Solutions, LLC*, Case No. 6:09-CV-395-ORL-28-DAB, currently pending in the U.S. District Court for the Middle District of Florida, Orlando Division, which is currently stayed and the outcome will be directly affected the Board's decision in this Appeal (*id.*)

The claimed subject matter pertains to a method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding, to the suspensions or dispersions, a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt.

2

A3

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

According to the '279 Patent, calcium carbonate is used in various industrial processes and products, such as in recycling, paper production, and cement ('279 Patent, col. 1, ll. 15-23). Calcium carbonate is also a major cause of boiler scale when hard water is used in heating systems (*id.* at col. 1, ll. 40-41). The '279 Patent discloses that hydrochloric acid has been used in the prior art to treat and remove calcium carbonate deposits that occur when used in these processes, but the acid can corrode equipment and is noxious to humans (*id.* at col. 1, ll. 34-39). The '279 Patent teaches that it "has been discovered that urea hydrochloride is an inexpensive and useful agent for the removal of the build-up of water-insoluble metal salts on surfaces, and the dissolution of water-insoluble metal salt dispersions or suspensions." (*Id.* at col. 2, ll. 3-6). Urea hydrochloride is characterized as "useful in the removal or dissolution of calcium carbonate." (*Id.* at col. 2, ll. 9-11.)

> The use of urea hydrochloride to remove the build-up of water-insoluble metal salts on surfaces, and to dissolve water-insoluble metal salt dispersions or suspensions, has advantages over conventional methods using hydrochloric acid or other agents. For example, urea hydrochloride is less corrosive to metal equipment and other contact surfaces than the equivalent amount of hydrochloric acid, and has a significantly less tendency to release hydrogen chloride gas.

(*Id.* at col. 2, ll. 21-28.)

Claims 1-5 are pending and stand rejected by the Examiner under 35 U.S.C. § 103 as obvious in view of Dill (US 4,466,893, issued Aug. 21, 1984) and admitted prior art.

A4

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

Claim 1 is the only independent claim as reads as follows:

1. A method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt, wherein a molar ratio of urea to hydrochloric acid approximately between 1:4 and 4:1 is used to form said urea hydrochloride.

## CLAIM INTERPRETATION

Claim 1 is directed to a "method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt."

The issue in this appeal is whether solubilizing "calcium carbonate in . . . dispersions of calcium carbonate" includes removing calcium carbonate residue from surfaces. During reexamination, the PTO must give the terms in a claim their broadest reasonable construction consistent with the specification as they would be understood by one of ordinary skill in the art. *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1364 (Fed. Cir. 2004); *In re Suitco Surface, Inc.*, 603 F.3d 1255, 1259 (Fed. Cir. 2010); *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142 (Fed. Cir. 2012). There are two distinct inquiries: what the term "dispersion" means to one of ordinary skill in the art; and whether the term "dispersion" has a special meaning in the patent specification that deviates from what the term means to one of ordinary skill in the art?

We first turn to the '279 Patent specification. The '279 Patent draws a distinction between removing calcium carbonate deposits from surfaces and removing calcium carbonate dispersions from water and liquid effluents.

4

A5

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

For example, the '279 Patent states that a "disadvantage of using calcium carbonate" is that "it is only very slightly soluble in water, and thus tends to build up as a deposit on surfaces, or form a dispersion in water-based liquids" ('279 Patent, col. 1, ll. 24-27). The '279 Patent refers to removing the dispersions from effluents:

> This effluent cannot be disposed of in publicly owned treatment
> facilities because of its solids content and pH. In a typical
> process, hydrochloric acid is added to the water to dissolve the
> calcium carbonate, removing the dispersion.

('279 Patent, col. 1, ll. 32-36.)

The '279 Patent describes its invention as the use of urea hydrochloride "for the removal of the build-up of water-insoluble metal salts on surfaces, and the dissolution of water-insoluble metal salt dispersions or suspensions." ('279 Patent, col. 2, ll. 3-6.)

The term "dispersion" is therefore used in the specification to refer to calcium carbonate dispersed in liquid. In view of this disclosure, one of ordinary skill in the art would have reasonably construed the phrase "solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate" to mean removing the calcium carbonate that is dispersed or suspended within a liquid effluent. The Examiner concluded that the explicit language of the claim also leads to this interpretation, finding that "aqueous" in the phrase "aqueous suspensions or dispersions" modifies the term "dispersions," as well as the term "suspensions" (Answer 4).

As noted by the Examiner, the prosecution history also supports this interpretation. During prosecution, the claims were amended on October 16, 1995 (underlining and brackets part of the original):

5

A6

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

> 1. (Amended) A method to [remove undesirable solids comprising water-insoluble metal salt] solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes [treating the solids with] adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the [water insoluble salt] calcium carbonate to a water soluble salt.

> 14. (Amended) A method to [remove undesirable solids comprising water-insoluble metal salt] solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes [treating the solids with] adding to the suspensions or dispersions a strong acid/weak base salt that includes at least one equivalent unit of weak base for every equivalent unit of strong acid, wherein the strong acid/weak base salt is used in a sufficient amount to convert the [water insoluble salt] calcium carbonate to a water soluble salt.

In arguing a prior art rejection over claim 14 during the original prosecution of the '279 Patent, Patent Owner stated:

> The invention as now claimed provides a method to lower the solids content of industrial liquids that contain calcium carbonate, and to treat the effluent from paper manufacturing and recycling processes. These problems, or the solutions for these problems, are not addressed or even suggested by Young [cited prior art rejection]. Accordingly, the rejection under Section 102(b) should be withdrawn.

(Response dated October 16, 1995, p. 8; emphasis added.)

Claim 1 was amended in the same way as claim 14. In both cases, the claims were narrowed to recite a method to "solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate," as in claim 1 currently at issue in this appeal. Patent Owner's own characterization of the claimed invention is that the urea hydrochloride is used to lower the solid

6

A7

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

content of liquids and to treat effluents. This statement is consistent with the claim language and specification disclosure discussed above that "dispersions of calcium carbonate" is a reference to calcium carbonate in a liquid, as distinguished from calcium carbonate being present on a surface as a deposit.

Patent Owner contends that this interpretation is too narrow, and that dispersion should include "solid dispersions (deposits)" on a surface (Appeal Br. 17). To support the argument that a dispersion can be a "solid dispersion" on a surface, Patent Owner provided declarations by Laren M. Tolbert, Ph.D. (First Tolbert Declaration, dated February 1, 2012; Exhibit 2A attached to Appeal Br.; "First Tolbert Decl.") (Second Tolbert Declaration, dated May 21, 2012; Exhibit 4A attached to Appeal Br.; "Second Tolbert Decl.") Dr. Tolbert has a Ph.D. in organic chemistry, with "extensive knowledge of acid-base chemistry," and is a Professor in the School Of Chemistry at Georgia Institute of Technology (First Tolbert Decl. ¶¶ 2, 3, & 4). Dr. Tolbert was also employed by Shell Oil Company as a geophysicist (Second Tolbert Decl. ¶ 3). In view of his academic credentials and experience, we find that Dr. Tolbert is qualified to testify as to the matters in his declaration.

Dr. Tolbert testified that "dispersions are generally associated with a material of one composition dispersed in another material, the bulk substance, which may be a solid, liquid, or gas." (Second Tolbert Decl. ¶ 6). Dr. Tolbert further testified:

> [D]ispersions can be solid within solids as well. When a
> suspension settles, the particles begin to agglomerate but
> maintain some similarity to their suspended state. For instance,

7

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

> they can be surrounded by molecules of water, even though
> they are no longer suspended in water. Even as the deposited
> particles dry, if they are finely divided particles dispersed
> throughout a bulk substance or if they surround other finely
> divided particles the system is a solid-in-solid dispersion.

(Second Tolbert Decl. ¶ 7.)

While Dr. Tolbert articulated a definition of a "dispersion" that included "solids within solids," he did not provide testimony or evidence that a calcium carbonate deposit on a surface would be considered a dispersion of calcium carbonate as that term is used in the '279 Patent.

Patent Owner made that same argument to the Examiner. On pages 13-14 of the Response to an Office Action, filed on February 1, 2012 (Exhibit 2 attached to Appeal Br.), Patent Owner provides evidence that the '279 Patent describes build-up of calcium carbonate and water-insoluble metal salts on surfaces, but Patent Owner did not establish that such build-up would be considered a solid-in-solid dispersion. For example, Patent Owner describes the patent as covering "solid particles of calcium carbonate settled onto a surface with other solid particles (a solid in solid dispersion where the calcium carbonate is either the bulk or dispersed phase)" (Exhibit 2, p. 14), but Patent Owner did not point to supporting disclosure in the '279 Patent where this "solid-in-solid dispersion" is described or extrinsic evidence that the build-ups described in the '279 Patent are solid-in-solid dispersions. Moreover, as discussed above, Dr. Tolbert in his second Declaration did not establish a connection between the definition of a solid dispersion and the so-called build-up of calcium carbonate on surfaces as described in the '279 Patent specification.

8

A9

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

Alternatively, Patent Owner contends that abrading calcium carbonate from a surface would create an aqueous suspension of calcium carbonate, and that the urea hydrochloride present during the abrading process would convert the calcium carbonate in the suspension to a water soluble salt as recited in claim 1 (Appeal Br. 20-21). Thus, Patent Owner's second theory is that the claim covers abrading calcium carbonate from surfaces because, during the abrading process, an aqueous suspension of calcium carbonate would be produced. In response to the Examiner's finding that the concept is not disclosed in the patent, Patent Owner states "the concept is inherent in the reaction, would have been understood by a person skilled in the art given the other teachings in the '279 patent, and need not be spelled out in the patent." (*Id.* at 21.)

Patent Owner provided adequate evidence that applying a solution of urea hydrochloride to a solid deposit of calcium carbonate would result in a suspension of calcium carbonate. Such evidence comprises testimony by Dr. Tolbert (Second Tolbert Decl. ¶ 10) and district court testimony by Dr. Kimberly Kurtis (Appeal Br. 18-20).

However, the Examiner found that "the claimed method requires the act of adding urea-HCl to an aqueous suspension or dispersion of calcium carbonate that is already there, and is thus distinct from forming a suspension or dispersions of small pieces of calcium carbonate-containing concrete or scales in the urea-HCl solution." (Answer 10.) Patent Owner contends that the Examiner's interpretation ignores the "scientific reality of the claimed reaction." (Appeal Br. 22.) Patent Owner argues that urea hydrochloride is continuously "added" to the reaction as urea hydrochloride

9

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

molecules in the solution continuously contacts calcium carbonate
molecules. (*Id.*) That is, as one molecule of calcium carbonate is converted
to the soluble salt, a "new" calcium carbonate molecule is exposed and a
molecule of urea hydrochloride is "added" to it. (*Id.*)

There are two disputed definitions of the term "adding" recited in
claim 1. First is the Examiner's definition that "adding" refers to the bulk
addition of urea hydrochloride to a calcium carbonate suspension or
dispersion. Second is Patent Owner's definition that "added" refers to the
microscopic chemical reaction that is taking place in the suspension.

To support their definition, Patent Owner points to paragraphs 10 of
Dr. Tolbert's First and Second Declarations (Appeal Br. 22). We have
considered this written testimony but do not find it persuasive since it does
not address the meaning of the term "adding" as it would be understood by
one of ordinary skill in the art. Rather, Dr. Tolbert is simply describing the
dissolution process, but does not give his opinion on the meaning of the term
"adding" as recited in claim 1.

The '279 Patent does not provide a special definition for the term
"adding." However, the patent uses it in the same way that the Examiner
does, i.e., to mean adding bulk urea hydrochloride to a solution. For
example, the patent describes "a typical process" in which "hydrochloric
acid is added to the water to dissolve the calcium carbonate, removing the
dispersion." ('279 Patent, col. 1, ll. 34-36.) Since Patent Owner provided
insufficient evidence to support their interpretation, we will not interpret
"adding" to include the microscopic chemical reaction that occurs in

10

A11

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

solution, but rather shall construe the term "adding" to mean the bulk addition of urea hydrochloride to a suspension or dispersion.

## REJECTION

Based on disclosure in the '279 Patent (e.g., col. 1, ll. 29-36), the Examiner found it was well known to use hydrochloric acid ("HCl") to dissolve calcium carbonate in aqueous suspensions or dispersions (Answer 9). The Examiner further found it was general knowledge "that calcium carbonate dissolves in acid, such as HCl, with evolution of carbon dioxide. Calcium carbonate (limestone), which is water-insoluble, reacts with HCl to form calcium chloride, which is water-soluble (Condensed Chemical Dictionary, 7th Edition, 1966, pages 162 and 163)." (*Id.*) The Examiner cited Dill for its teaching of using urea hydrochloride, rather than HCl alone, to dissolve limestone which is made of calcium carbonate (*id.*). The Examiner found that one of ordinary skill in the art would have had reason to use urea hydrochloride, instead of HCl alone, to dissolve calcium carbonate in suspensions and dispersions for the advantages described in Dill (*id*). The Examiner further found that urea hydrochloride, when contacted with calcium carbonate, "would predictably produce calcium chloride, which is a water-soluble salt" (*id).*

A. Dill as non-analogous art

In making an obviousness determination, the first step is to ascertain the prior art. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (Fed. Cir. 1966). Prior art which is pertinent to the claimed invention is referred to as

11

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

"analogous" prior art.  It is well-established that there are two criteria to be
applied when determining whether a prior art reference is analogous:  (1)
whether the reference is from the same field of endeavor as the claimed
invention, and (2) if the reference is not within the same field of endeavor,
whether the reference "is reasonably pertinent to the particular problem with
which the inventor is involved."  *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir.
2004); *In re Clay*, 966 F.2d at 659,660 (Fed. Cir. 1992).

    Patent Owner contends that Dill is non-analogous art.

    First, Patent Owner argues that Dill and the invention of the '279
Patent are not in the same "field of endeavor."  Patent Owner contends that
the field of endeavor of the '279 Patent "is cleaning calcium carbonate
suspensions and dispersions from water-based liquids and surfaces
contacting the water based liquids, i.e., removing calcium carbonate
suspended or dispersed in or from a water-based liquid while protecting the
surroundings." (Appeal Br. 7.)  Furthermore, Patent Owner contends, the
inventors solved the problems "listed in the specification of effluent that
could not be disposed of, corrosion to equipment, and hazards to human
health," making the process safe (*id.* at 8).  In contrast, Patent Owner
contends that Dill is related to subterranean drilling whose purpose is to
damage the surroundings by creating fractures, etchings, and openings
through which oil and natural gas can flow (*id.*)  "Harsh conditions are used
due to the harsh environment and the lack of concern for protecting the
surroundings."  (*Id.*)  Thus, Patent Owner argues that "the field of Dill is
extraction of oil and natural gas from a subterranean formation," while the

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

field of the '279 Patent is "cleaning calcium carbonate from water based
liquids and surfaces contacting those liquids." (*Id.* at 10.)

Second, Patent Owner contends that a person of ordinary skill in the
art of the '279 Patent would not have considered Dill pertinent to the subject
matter of the '279 Patent or the problem the inventors were trying to solve
(Appeal Br. 4). According to Patent Owner, the Dill is concerned with
"extending reaction time, improving stability of thickening or viscosifying
agents (i.e., the gel), and reducing corrosive fumes emanating from a well
bore." (*Id.* at 11.) The urea in Dill, Patent Owner contends, is used to
extend the viscous stability of a gelled acid composition (*id.* at 11-12).
Patent Owner argues that none of these concerns would have been pertinent
to the '279 Patent whose problem "is preventing adverse effects on man-
made systems caused by suspensions and dispersions of calcium carbonate
and doing so in a way that does not itself damage the systems." (*Id.*)

A preponderance of the evidence supports a finding that one of
ordinary skill in the art would have found Dill reasonably pertinent to the
problem faced by the inventors. According to Patent Owner, one of the
problems when using hydrochloric acid to remove or dissolve calcium
carbonate is that the acid causes "corrosion to equipment, and hazards to
human health" (Appeal Br. 7). Consistently, the '279 Patent discloses that
"hydrochloric acid is a gas that can corrode equipment and is noxious to
humans." '279 Patent, col. 1, ll. 37-39. The patent states that the use of urea
hydrochloride solved this problem:

> For example, urea hydrochloride is less corrosive to metal
> equipment and other contact surfaces than the equivalent

13

A14

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

> amount of hydrochloric acid, and has a significantly less
> tendency to release hydrogen chloride gas.

('279 Patent, col. 2, ll. 25-28.)

Dill describes using acid to dissolve calcareous rock, the latter which

comprises calcium carbonate.[1]

> The composition then is introduced into the subterranean
> formation. The acid is introduced into the subterranean
> formation whereby the calcareous rock in the formation is
> dissolved thereby increasing the permeability, and permitting
> better flow of fluids through the formation.

(Dill, col. 3, ll. 29-34; emphasis added.) Thus, contrary to Patent Owner's

statements, both Dill and the '279 Patent are concerned with removing or

dissolving calcium carbonate.

Dill discloses that its urea hydrochloride also addresses the same

problem described in the '279 Patent of corrosion and harmful gas

associated with the use of hydrochloric acid:

> Still another problem that is frequently encountered in an
> acidizing operation is the release of corrosive fumes as the acid
> is injected down the well bore. These fumes can cause
> corrosion to the surface equipment used to carry out the
> operation and cause irritation and discomfort to the persons
> near the equipment.
>
> The present invention provides a composition and
> method for acid treating a subterranean formation which helps
> overcome the above-mentioned problems.

(Dill, col. 1, ll. 56-64.)

Thus, even if the field of endeavors are considered to be different, one

of ordinary skill in the art would have considered Dill reasonably pertinent

---

[1] "of, containing, or like calcium carbonate; chalky: calcareous earth."
Dictionary.reference.com/browse/calcareous (accessed September 24, 2013).

14

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

to the invention described in the '279 Patent since both were concerned with

the corrosive and harmful effects of hydrochloric acid when being used to

dissolve calcium carbonate materials.

With respect to the field of endeavor, it is true that the bulk of the

'279 Patent disclosure is about removing build-up of calcium carbonate from

surfaces and industrial liquids ('279 Patent, col. 1, ll. 56-67), while Dill is

concerned with acidizing or fracturing a subterranean formation to obtain

gas or oils (Dill, col. 1, ll. 9-28). However, the following disclosure from

the '279 Patent cannot be ignored:

> Urea hydrochloride, as well as the equivalent strong acid/weak
> base salts disclosed herein, can also be used as an acid
> replacement in any process that hydrochloric acid (also referred
> to as muriatic acid) has traditionally been used in, including but
> not limited to acidizing (activation) of petroleum wells, boiler
> scale removal, ore reduction, food processing (e.g., corn syrup
> and sodium glutamate), pickling and metal cleaning, industrial
> acidizing, general cleaning . . .

('279 Patent, col. 3, ll. 21-29; emphasis added.)  Thus, the inventors

themselves recognized the application of their urea hydrochloride to

acidizing oil wells, the same field of endeavor as Dill.  We find this to be

additional evidence that one of ordinary skill in the art would have

considered Dill pertinent to the same problem addressed by the inventors of

the '279 Patent, namely to avoid the corrosive and noxious effects when

using hydrochloric acid to dissolve calcium carbonate.

Dr. Tolbert testified in his written declaration "that the use of urea to

stabilize a gel in a well-drilling application [as described in Dill] is unrelated

to the use of urea in solubilizing suspensions of calcium carbonate in bulk

water or cleaning dispersions of calcium carbonate." (Second Tolbert Decl.

15

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

¶ 11.) According to Dr. Tolbert, it is "unsupported" that Dill is "'directed to
dissolving calcium carbonate." (*Id.*) Dr. Tolbert testifies that "the issue
addressed in Dill is not solubilization *per se*, but mechanical alteration of the
structure of the limestone to allow fluid flow." (*Id.* at ¶ 12.)

Dr. Tolbert's testimony is not persuasive. As noted in the passage
reproduced above, Dill explicitly describes that "the calcareous rock in the
formation is dissolved" upon introduction of the urea hydrochloride into the
formation (Dill, col. 3, ll. 29-34). Dill also describes the "limestone
dissolving efficiency" of a urea hydrochloride composition at various
strengths and temperatures (*id.* at col. 4, ll. 41-42 & 55-65). Dr. Tolbert
admitted that limestone contains calcium carbonate (First Tolbert Decl. ¶ 9),
and calcareous rock by definition also contains calcium carbonate. Thus,
contrary to Dr. Tolbert's opinion, there was factual support for the
Examiner's findings that Dill describes dissolving calcium carbonate with
urea hydrochloride. We are also not persuaded by Dr. Tolbert's further
statement that it is not dissolution which occurs in Dill, but rather "the
creation of porous material through the transformation of the subterranean
material." Second Tolbert Decl. ¶ 13.) It is unclear how pores and
transformation would occur without <u>dissolving</u> the calcium carbonate. Dr.
Tolbert simply has not offered an explanation for this alleged process, nor
specifically addressed the disclosure in Dill in which dissolution of calcium
carbonate is expressly described.

Patent Owner also argues that the conditions utilized in Dill are
extreme with respect to temperature and pressure, while, in the '279 Patent,
processes are carried out at ambient conditions (Appeal Br. 13-14). Dr.

16

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

Tolbert testified that carbon dioxide was generated at ambient temperatures when used for the applications disclosed in the '279 Patent (Second Tolbert Decl. ¶ 10). However, under the extreme conditions described in Dill, Dr. Tolbert testified that carbon dioxide would not evolve (*id.* at ¶ 13). We are not persuaded by this testimony.

Dr. Tolbert did not establish that the absence of carbon dioxide would have led the skilled artisan to the expectation that a water soluble salt, as required by claim 1, would not have been produced under using Dill's conditions. Therefore, as found by the Examiner, there would have been a reasonable expectation of success that when the urea hydrochloride composition of Dill was applied to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate a water soluble salt would be produced as claimed. Furthermore, we note that claim 1 is not limited to specific set of conditions or processes.

B. Reason to combine

Patent Owner contends that the skilled worker would not have applied Dill to the problem solved by the '279 Patent of removing calcium carbonate from suspensions and dispersions and keeping them from reforming or depositing on surfaces by converting the calcium carbonate to a water soluble salt (Appeal Br. 14). Patent Owner states:

> While Dill teaches reacting calcium carbonate with a variety of acids, Dill is unconcerned with converting calcium carbonate to a water soluble salt. In fact, a person skilled in the art would understand two of the four acids disclosed by Dill to lead to water-*insoluble* products.

(*Id.*)

17

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

Dr. Tolbert testified that "[c]onversely, Dill observes that reaction
with hydrochloric acid with limestone produces a precipitate, which is
contrary to the chemistry of calcium carbonate and to the use of urea
hydrochloride to dissolve calcium carbonate." (Second Tolbert Decl. ¶ 12.)

Contrary to Dr. Tolbert's statement that the reaction of limestone with
hydrochloric acid produces a precipitate, the following explicit disclosure
appears in Dill instructing that precipitates were undesirable and how to
avoid them.

> If hydrochloric acid is the acid composition used to carry out
> the invention, a hydrochloric acid strength of greater than 35
> percent by weight of acid has been found not to be particularly
> desirable as a precipitate will form when the hydrochloric acid-
> urea composition reacts with limestone.

(Dill, col. 2, ll. 6-11; emphasis added.)

Although Dill does not expressly teach the formation of a soluble salt,
Dill teaches that precipitates are undesirable and teaches that they can be
avoided by using an acid strength of less than 35 percent by weight. Thus,
Dr. Tolbert's statement that "Dill observes that reaction with hydrochloric
acid with limestone produces a precipitate" ignores Dill's teaching that such
precipitates are characterized as undesirable. (Second Tolbert Decl. ¶ 12.)
Dill's teaching, when applied to aqueous suspensions and dispersions, would
have led to the formation of water soluble salt as claimed.

Patent Owner cites paragraph 13 of the First Tolbert Declaration to
support its position that it would be unpredictable that a water soluble salt
would be formed upon reaction of urea hydrochloride with calcium
carbonate (Reply Br. 14-15). However Dr. Tolbert does not make this
conclusion in paragraph 13, but rather states that urea hydrochloride "has a

18

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

strong driving force for this process" of dissolving calcium carbonate solids by conversion to a water soluble salt, pointing to the opposite conclusion that forming a water-soluble salt would have been predictable by one of ordinary skill in the art.

Patent Owner argues that Dill teaches urea as "a stabilizing agent for a gel used with multiple acids, only one of which is urea hydrochloride. Dill provides examples of preparing several gelled acid compositions, testing the stability of the gels, and using the gels to react materials under conditions mimicking subterranean conditions (i.e., high temperature and pressure)." (Appeal Br. 10.)

While it is true that other acids are disclosed in Dill, the "preferred acid is hydrochloric acid." (Dill, col. 2, ll. 2-3.) Examples I-IV use hydrochloric acid to make the urea hydrochloride; Examples V and VI use other acids to make the urea acid composition. Because of the pattern of preferences, a person of ordinary skill in the art would have had reason to have picked urea hydrochloride from Dill. With respect to the teachings in Dill that urea stabilizes a gel composition comprising hydrochloric acid (*id.*, Examples I, Table III, Table IV), the claims do not exclude a gel and given the teaching in Dill that urea hydrochloric acid overcomes the problem of corrosive fumes (*id.* at col. 1, ll. 56-67), one of ordinary skill in the art would have had reason to use it in applications in which dissolution of calcium carbonate is desired.

19

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

## SECONDARY CONSIDERATIONS

In making an obviousness determination, it is necessary to consider evidence of secondary considerations. *Graham*, 383 U.S. 1 at 17-18 (1966). We thus turn our attention to Patent Owner's evidence.

Patent Owner describes its invention as solving the problem of removing calcium carbonate build-up on surfaces and lowering its content in industrial liquids "without damaging the surroundings." (Reply Br. 12.) Patent Owner states "the '279 inventors were faced with the problem of preventing adverse effects on systems and equipment caused by suspensions and dispersions of calcium carbonate and doing so in a way that does not itself damage the systems or equipment and does not allow the suspensions and dispersions to reform." (*Id*. at 11.)

However, Dill teaches that acid used to acidify calcareous rock formations when obtaining oil causes "corrosion to the surface equipment used to carry out the operation and cause irritation and discomfort to the persons near the equipment," and describes urea hydrochloride as a solution to this problem (Dill, col. 1, ll. 47-67). Dill also teaches that its urea hydrochloride dissolves calcareous rock, which comprises calcium carbonate (*id*. at col. 3, ll. 28-34). While it is true that Dill does not describe dissolving calcium carbonate in suspensions and dispersions, Dill does solve the same problem posed by the '279 inventors of eliminating the hazards associated with hydrochloric acid use, while still maintaining its ability to dissolve calcium carbonate without forming precipitates (*id*. at col. 1, ll. 56-76; col. 2, ll. 6-12; col. 3, ll. 28-34). Thus, PO has not established a pervasive need that was not already addressed by the prior art.

20

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

Patent Owner provided evidence of commercial success, praise in the industry, and copying to establish the non-obviousness of the claimed subject matter.

Commercial success

Testimony was provided by Mick Williams, Chief Operating Office of Peach State Labs ("PSL") (First Williams Declaration, dated February 1, 2012: Exhibit 2B attached to Appeal Br.; "First Williams Decl."), of the commercial success of products sold by PSL that contained urea hydrochloride ("UHCl"). Mr. Williams testified that, from 1998 through 2011, PSL manufactured and sold through distributors a total of over 64,000,000 (million) pounds of concentrated urea hydrochloride for the use as described in the '279 Patent (First Williams Decl. ¶ 16).

Further evidence was provided by Roger Dexter, a Marketing and Application Specialist for PSL, who had previously worked at Betz Dearborn/BetzPaperChem (First Dexter Declaration, dated February 1, 2012; Exhibit 2C attached to Appeal Br.; "First Dexter Decl.") (First Dexter Decl. ¶ 2 and 3). Mr. Dexter stated that while working at Betz Dearborn, as a result of his testing and recommendation, "Betz Dearborn negotiated an exclusivity contract with Crews Chemical to sell a UHCl product for the Pulp and Paper Industry gaining a major advantage over Competitors" (*id.* at 6). Mr. Dexter stated that the "efficiency and safety of urea hydrochloride were a huge benefit to our customers." (*Id.* at ¶ 7). Furthermore, Mr. Dexter testified that "Typically it takes about a year for a customer to try a new product, test it, make the business decision to implement it, and finally

21

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

actually implement the products. However, we experienced very rapid growth with the UHCl product. Within 2 years sales topped 1 million pounds." (*Id.*) The product was used to clean scales from equipment (First Dexter Decl. ¶¶ 4, 8, 12; attached Exhibit 1 to Dexter Decl.).

It is well established that for evidence of secondary considerations to be accorded substantial weight, there must be a nexus between the claimed invention and what is relied upon as the secondary consideration. *In re GPAC, Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995). A nexus is established when the secondary consideration is attributed to a feature of the claimed invention. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12.

First, we must look at the nexus between the claimed invention and the commercial success. In paragraph 16 of Mr. Williams's first declaration, where the 64 million tons of total sales number is disclosed, Mr. Williams describes sales to distributors of urea hydrochloride, but not the use to which the urea hydrochloride was applied. The latter is significant because the claims are not directed to a urea hydrochloride composition but to a method to "solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding to the suspensions or dispersions a sufficient amount of urea hydrochloride." ('279 Patent, Claim 1.) For example, claim 2 recites that "the calcium carbonate is in paper manufacturing process water" and claim 5 that "the calcium carbonate is in paper recycling process water." Mr. Williams in his declaration refers to removing concrete and scales from equipment with urea hydrochloric acid (First Williams Decl. ¶¶ 12 and 15), uses that we have determined not to be within the scope of the claim.

22

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

In his second declaration (Second Williams Declaration, dated May 21, 2012; Exhibit 4B attached to Appeal Br.; "Second Williams Decl."), Mr. Williams describes sales to distributors who service companies that sell products containing urea hydrochloride for removing calcium carbonate suspensions and dispersions in the form of deposits on household and industrial surfaces and from paper process streams and equipment (Second Williams Decl. ¶ 9). Some of these uses are covered by claim 1. However, Mr. Williams did not establish what part of the 64 million pounds of urea hydrochloride that was sold went to the uses covered by the claims. Similarly, the rapid growth in sales of urea hydrochloride reported by Mr. Dexter was to clean scales from equipment, not the claimed method.

In the Reply Brief, Patent Owner argues that urea hydrochloride is added after some calcium carbonate suspension or dispersion is formed as the solid material is acted upon by the urea hydrochloric acid and thus falls within the scope of the claim as we have interpreted it because a dispersion is present after the solid reacts with urea hydrochloride (Reply Br. 24). However, even if this is the case, insufficient evidence was provided to establish that this is how the urea hydrochloride is utilized in these circumstances, and how much of the sales accounted for this use. Nonetheless, we shall not ignore such evidence since Patent Owner did provide testimony that such uses involved turning calcium carbonate into a water soluble salt, which is a recited step and nexus with the claimed subject matter (First Williams Decl. ¶¶ 5, 12, and 13). Thus, we shall address the sales data.

23

A24

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

Both the Williams and Dexter declarations establish that the product
was successful, but it is hard to judge the level of success, in view of the
lack information on the size of the market to know how substantial the total
sales of 64 million pounds of urea hydrochloride are from 1997 to 2012.
The numbers provided are only given in units (tons) and that alone "provides
a very weak showing of commercial success, if any."[2] *In re Huang*, 100
F.3d 135, 140 (Fed. Cir. 1996).

Indeed, if the safety and efficacy of the product is responsible for the
sales, as stated by Williams and Dexter, these advantages were described by
Dill, and therefore the commercial success is related to benefits that were
known in the art. "[T]he asserted commercial success of the product must
be due to the merits of the claimed invention beyond what was readily
available in the prior art." *J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106
F.3d 1563, 1571 (Fed. Cir. 1997).

Patent Owner also provided evidence that consumers pay 150 times as
much for urea-HCl than they would have had to pay for its components
(Appeal Br. 31). Patent Owner argues that customers are capable of making
their own blend of urea and hydrochloric acid, but purchase it instead (Reply
Br. 28-29). However, Patent Owner has not provided objective evidence of
why customers purchased the blend rather than preparing it themselves, nor

---

[2] "Huang has simply not provided sufficient information upon which
the PTO could determine whether the grips were commercially successful."
Although Huang's affidavit certainly indicates that many units have been
sold, it provides no indication of whether this represents a substantial
quantity in this market. This court has noted in the past that evidence related
solely to the number of units sold provides a very weak showing of
commercial success, if any."

24

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

has Patent Owner provided adequate evidence that customers were in fact capable of making it themselves. The arguments are attorney argument and, without objective evidence, are accorded little weight. For example, other reasons could have driven customers to buy the already prepared urea hydrochloric acid rather than prepare their own, including convenience and existence of the '279 Patent. In fact, according to Mr. Williams, Rochester Midland made its own urea hydrochloric acid until it was made aware of the '279 Patent, after which it became a distributor of it (First Williams Decl. ¶ 14).

Patent Owner also argued that consumers desiring to solubilize calcium carbonate switched from the less expensive prior art hydrochloric acid to the much more expensive inventive product urea hydrochloride (Appeal Br. 31). To support this argument, Patent Owner cited Exhibit 4.D which is trial testimony by Mr. Mark Gallagher, an accountant who is said to be qualified in the area of damage valuation (Exhibit 4.D, p. 4: 9-10; p. 6: 18-20). Mr. Gallagher testified about the profit made after purchasing the raw materials to make urea hydrochloride (id. at p. 22: 1-12). However, Mr. Gallagher's testimony is insufficient to establish that customers switched from the cheaper hydrochloric acid to the more expensive urea hydrochloride. As such, we find it to be attorney argument, which is accorded little weight.

Copying

Patent Owner contends that the commercial urea hydrochloride products used in the claimed method have been copied. Mr. Williams

25

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

testified in his first declaration that Rochester Midland had sampled PSL's
product and had begun producing urea hydrochloride on its own to be used
in the method described in the '279 Patent (First Williams Decl. ¶ 14).
According to Mr. Williams, PSL informed Rochester Midland of the patent
and, after extensive review, Rochester Midland chose to become a
distributor of PSL's technology (*id.*). Mr. Williams also testified that after
purchasing PSL's UHCl products for years, EMS began producing its own
(*id.* at 15). Sufficient evidence was presented by Mr. Williams that the EMS
product contains urea hydrochloride (*id.* at 15; attached Exhibit 4).

Praise

A declaration by John MacDonald of EMS is attached as Exhibit 3 to
the First Williams Declaration. The declaration appears to be evidence
submitted in the infringement litigation between EMS and Peach State Labs.
Mr. MacDonald testified that certain products of EMS contained urea
hydrochloride and provided information sheets for these products. Three of
these product information sheets, which are said to describe products with
urea hydrochloride, list the product as the 2006 winner of the "Most
Innovative Products" with a reference to Concrete Producer Magazine. (*See*
First Williams Decl., Exhibit 3, Exhibit C-1 attachment to Exhibit 3.) Patent
Owner says this is "praise by the industry" and evidence of commercial
success (Appeal Br. 33.)

We give this little weight. There is scant information on the award to
understand what is being "praised." Nor did Patent Owner provide
information on how it is determined to confer the "Most Innovative Product"
award on a product, e.g., who nominates the product, how competitive was

26

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

the award, and what was considered innovative about the product. In addition to this, the nexus between the EMS products and the claimed invention is weak. Mr. MacDonald explained how the product is used: "(2) apply the product to the truck exterior surface; and (3) rinse the product off the truck exterior surface." (Exhibit 3 attached to First Williams, paragraph 10 of the McDonald Declaration.) The urea hydrochloride is added only in the first step. There is no subsequent step as recited in claim 1 of "adding" urea hydrochloride to a dispersion or suspension of calcium carbonate. Thus, the nexus, if any, between how the EMS product is used and the claimed method is weak.

## SUMMARY

Patent Owner provided evidence of commercial success of the claimed urea hydrochloride, including sales information as described in declarations by Mr. Williams and Mr. Dexter, and also evidence of copying. However, when this evidence is weighed with the countervailing evidence of obviousness in view of Dill and the admitted prior art, we conclude that the claimed method would have been obvious to one of ordinary skill in the art at the time of the invention. In particular, the evidence of commercial success has a weak nexus to the claimed invention since it was not firmly established what part of the sales data is attributable to the claimed method of "adding to the suspensions or dispersions [of calcium carbonate] a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt." ('279 Patent, claim 1.) In addition to this, while Patent Owner asserted that the '279 Patent inventors had solved the problem

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279

associated with using noxious and corrosive hydrogen chloride as an acid to dissolve calcium carbonate, Dill in fact had already discovered that a composition comprising urea hydrochloride, when used to dissolve rock comprising calcium carbonate, avoided these same problems. Thus, the advantages relied upon by Patent Owner in making their non-obviousness arguments were known in the prior art. Based on such advantages, a person of ordinary skill in the art would have found it obvious to have used urea hydrochloride as taught by Dill for other applications in which calcium carbonate dissolution was desired, including solubilizing calcium carbonate in aqueous suspensions or dispersions of calcium carbonate as recited in claim 1.

For the foregoing reasons, we affirm the rejection of claim 1. Claims 2-5 were not argued separately and fall with claim 1.

## TIME PERIOD FOR RESPONSE

Requests for extensions of time in this *ex parte* reexamination proceeding are governed by 37 C.F.R. § 1.550(c). *See* 37 C.F.R. § 41.50(f).

## AFFIRMED

alw

28

Appeal 2013-008300
Reexamination Control 90/011,628
Patent 5,672,279


PATENT OWNER:

John S. Pratt, Esq.
Kilpatrick, Townsend & Stockton LLP
1100 Peachtree Street
Suite 2800
Atlanta, GA 30309



THIRD PARTY REQUESTER:

Jacqueline E. Hartt, Ph.D.
GRAYROBBINS, PA
P.O. Box 3068
Orlando, FL 32802-3068

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

IN RE PEACH STATE LABS, INC.   )   **APPEAL NO:**
<u>Reexamination No. 90/011,628</u>   )

<u>NOTICE FORWARDING CERTIFIED LIST</u>

A Notice of Appeal to the United States Court of Appeals for the Federal

Circuit was timely filed on January 17, 2014, in the United States Patent and

Trademark Office in connection with the above identified re-examination

proceeding. Pursuant to 35 U.S.C. § 143, and Fed. Cir. R. 17(b)(1), a Certified

List is this day being forwarded to the Federal Circuit.

Appellant must contact the Solicitor's Office at 571-272-9035 to arrange

for designating the record pursuant to Fed. Cir. R. 30.

Respectfully submitted,

**Michelle K. Lee**
Deputy Under Secretary of Commerce for
Intellectual Property and Deputy Director of the
United States Patent and Trademark Office

Date: February 26, 2014    By: _Natasha Russ_
**Natasha Russ**
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the

foregoing, has been served on Appellant and Third Party Requester this 26th

day of February, 2014, as follows:

Jennifer L. Blackburn
Kilpatrick Townsend & Stockton LLP
1100 Peachtree Street NE, Suite 2800
Atlanta, GA 30309

Jacqueline E. Hartt, Ph.D.
Gray-Robinson, P.A.
P.O. Box 3068
Orlando, FL 32802-3068

By: _____

**Natasha Russ**
Paralegal

A32

Form PTO 55 (12-80)

## U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

February 26, 2014

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the contents comprised from the electronic file of the Patent Re-exam Application identified below; said contents being a list of the papers comprising the record before the United States Patent and Trademark Office for the Reexamination Proceeding of:

Applicant(s):  Peach State Labs, Inc.

Reexamination No:  90/011,628

Filed:  May 9, 2011

Title of Invention: Method for Using Urea Hydrochloride



By authority of the
**DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE**

Natasha M. Russ

*Certifying Officer*

Prosecution History Serial No. 90/011,628

| | |
|---|---|
| 04-06-2011 | Request for Ex Parte Reexamination |
| 04-06-2011 | Change in Power of Attorney for Third Party Requester |
| 04-06-2011 | Information Disclosure Statement (IDS) |
| 04-15-2011 | Notice of Failure to Comply with Ex Parte Reexam Request Filing Requirements |
| 05-09-2011 | Corrected Original Request for Ex Parte Reexamination |
| 05-10-2011 | Change in Power of Attorney |
| 05-10-2011 | Statement Under 37 CFR 3.73(b) |
| 05-16-2011 | Notice Regarding Change of Power of Attorney |
| 05-16-2011 | Notice of Acceptance of Power of Attorney |
| 05-17-2011 | Notice of Assignment of Reexamination Request |
| 05-17-2011 | Notice of Reexamination Request Filing Date |
| 05-24-2011 | Ex Parte Reexamination Interview Summary |
| 06-29-2011 | Order Granting Request for Ex Parte Reexamination |
| 08-29-2011 | Information Disclosure Statement (IDS) |
| 08-29-2011 | Notice of Waiver of Patent Owner Statement |
| 09-09-2011 | Supplemental Information Disclosure Statement (IDS) |
| 12-01-2011 | Non Final Office Action |
| 01-13-2012 | Proposed Agenda for January 17, 2012 Interview |
| 01-17-2012 | Ex Parte Reexamination Interview Summary |
| 02-01-2012 | Response after Non-Final Action |
| 02-10-2012 | Information Disclosure Statement (IDS) |
| 02-17-2012 | Information Disclosure Statement (IDS) |
| 03-21-2012 | Information Disclosure Statement (IDS) |
| 03-28-2012 | Notification of Court Ordered Stay Being Lifted |
| 05-21-2012 | Response after Non-Final Action |
| 05-21-2012 | Information Disclosure Statement |
| 07-06-2012 | Information Disclosure Statement (IDS) |
| 09-27-2012 | Final Office Action |
| 10-26-2012 | Notice of Appeal |
| 12-26-2012 | Appeal Brief |
| 03-07-2013 | Examiners Answer |
| 05-07-2013 | Reply Brief |
| 05-07-2013 | Request for Oral Hearing |
| 06-28-2013 | Patent Trial and Appeal Board Docketing Notice |
| 07-24-2013 | Notification of Appeal Hearing |
| 07-31-2013 | Request to Reschedule Oral Hearing |
| 07-31-2013 | Confirmation of Oral Hearing |
| 08-06-2013 | Order Granting Request to Reschedule Oral Hearing |
| 08-09-2013 | Notification of Appeal Hearing |
| 08-09-2013 | Corrected Order Granting Request to Reschedule Oral Hearing |
| 08-20-2013 | Confirmation of Oral Hearing |
| 11-18-2013 | Decision on Appeal |
| 01-17-2014 | Petition for Review |

## Copy of Rejected Claims

1.      A method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt, wherein a molar ratio of urea to hydrochloric acid approximately between 1:4 and 4:1 is used to form said urea hydrochloride.

2.      The method of claim 1, wherein the calcium carbonate is in paper manufacturing process water.

3.      The method of claim 1, wherein said ratio of urea to hydrochloric acid is approximately 2:1.

4.      The method of claim 1, wherein said ratio of urea to hydrochloric acid is approximately 1:1.

5.      The method of claim 1, wherein the calcium carbonate is in paper recycling process water.



US005672279A

# United States Patent [19]

## Sargent et al.

[11] **Patent Number:** 5,672,279

[45] **Date of Patent:** Sep. 30, 1997

[54] **METHOD FOR USING UREA HYDROCHLORIDE**

[75] Inventors: **R. Richard Sargent**, Rome; **Jeffrey Randolph Alender**, Marietta; **Thomas Hudson Moss, III**, Rome, all of Ga.

[73] Assignee: **Peach State Labs, Inc.**, Rome, Ga.

[21] Appl. No.: **233,348**

[22] Filed: **Apr. 25, 1994**

### Related U.S. Application Data

[60] Continuation-in-part of Ser. No. 90,797, Jul. 12, 1993, abandoned, which is a division of Ser. No. 919,523, Jul. 24, 1992, Pat. No. 5,234,466.

[51] **Int. Cl.**[6] ........................................ **C02F 5/12**

[52] **U.S. Cl.** ........................ **210/698;** 134/3; 134/22.14; 134/22.19; 162/45; 162/48; 252/180; 210/701; 510/240; 510/245

[58] **Field of Search** .......................... 134/3, 22.11, 19, 134/22.14, 22.19; 210/698–701; 162/45, 48; 252/87, 142, 148, 180, 181, 82

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,936,316 | 2/1976 | Gulla | 134/3 |
| 3,953,352 | 4/1976 | Mizutani et al. | 252/142 |
| 4,164,477 | 8/1979 | Whitley | 252/99 |
| 4,285,738 | 8/1981 | Ogata | 134/26 |
| 4,448,841 | 5/1984 | Glass et al. | 428/270 |
| 4,466,893 | 8/1984 | Dill | 166/307 |
| 4,673,522 | 6/1987 | Young | 252/148 |
| 4,756,888 | 7/1988 | Gallup et al. | 210/702 |
| 4,830,766 | 5/1989 | Gallup et al. | 210/696 |
| 4,882,202 | 11/1989 | Holtzan et al. | 427/98 |
| 4,894,169 | 1/1990 | Delitsky | 210/698 |
| 5,234,466 | 8/1993 | Sargent et al. | 8/585 |
| 5,308,401 | 5/1994 | Geke et al. | 134/2 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 37811 | 2/1986 | Hungary . |
| WO 94/02549 | 2/1994 | WIPO . |

*Primary Examiner*—Peter A. Hruskoci
*Attorney, Agent, or Firm*—Kilpatrick & Cody

[57] **ABSTRACT**

A method to remove the build-up of water-insoluble metal salts on surfaces, and a method to lower the solids content of industrial liquids that contain water-insoluble metal salts using urea hydrochloride or its equivalent. Also disclosed is a method to use urea hydrochloride or an equivalent strong acid/weak base salt as acid replacements for a variety of purposes.

**5 Claims, No Drawings**

5,672,279

## 1

## METHOD FOR USING UREA
## HYDROCHLORIDE

This application is a continuation-in-part of and claims priority to U.S. Ser. No. 08/090,797, filed on Jul. 12, 1993 now abandoned, which is a divisional of, and claims priority to U.S. Ser. No. 07/919,523, filed on Jul. 24, 1992, entitled "Lowering the pH of Textile Processing Solution by Adding Urea Sulfate as a pH Adjusting Agent," by R. Richard Sargent and Jeffrey R. Alender, now U.S. Pat. No. 5,234, 466.

This application describes methods for the use of urea hydrochloride.

### BACKGROUND OF THE INVENTION

Calcium carbonate is often used or produced in industrial processes. Calcium carbonate is used, for example, as a source of lime, a neutralizing agent, a filler or extender in rubber, paints, and plastics, in the fortification of bread, putty, tooth powders, antacid, and whitewash. It is also used in portland cement and metallurgical flux. Calcium carbonate is alternatively referred to as chalk, calcite, marble, limestone, and whiting. One major use of calcium carbonate is as an opacifying agent in paper production and recycling.

A disadvantage of using calcium carbonate is that it is only very slightly soluble in water, and thus tends to build up as a deposit on surfaces, or form a dispersion in water-based liquids. These residues and dispersions can be a nuisance or, more importantly, can adversely affect industrial processes or equipment. For example, $CaCO_3$ used in paper manufacture and recycling enters the effluent of the plant as a suspended solid that raises the pH of the water and causes the water to appear chalky. This effluent cannot be disposed of in publicly owned treatment facilities because of its solids content and pH. In a typical process, hydrochloric acid is added to the water to dissolve the calcium carbonate, removing the dispersion, and then the pH is adjusted to approximately neutral with base. However, hydrochloric acid is a gas that can corrode equipment and is noxious to humans.

Calcium carbonate is also a major cause of boiler scale when hard water is used in heating systems. It is sometimes difficult to remove the calcium carbonate boiler residue in a manner that does not adversely affect the equipment.

U.S. Pat. No. 4,830,766 discloses a method for treating an aqueous geothermal fluid that contains dissolved ferric cations and silicous material that tend to interact to form insoluble iron silicates, that includes adding a variety of reducing agents, including urea, urea hydrochloride, formamide, formamide hydrochloride, oxalic acid, and ascorbic acid.

Hungarian Patent No. 37,811 (Chem Abstr. 105:117062z 1986) discloses a composition for the removal of scale that includes hydrochloric acid (3–10%), urea or thiourea (0.2–1.0%), hexamethylenetetramine (0.2–1.5%) and water.

It is an object of the present invention to provide a method to remove the build-up of water-insoluble metal salts on surfaces.

It is another object of the present invention to provide a method to lower the solids content of industrial liquids that contain water-insoluble metal salts.

It is another object of the present invention to provide a method for the treatment of effluent from paper manufacturing and recycling processes.

It is another object of this invention to provide a method for the removal of water-insoluble salt residue from masonry.

## 2

### SUMMARY OF THE INVENTION

It has been discovered that urea hydrochloride is an inexpensive and useful agent for the removal of the build-up of water-insoluble metal salts on surfaces, and the dissolution of water-insoluble metal salt dispersions or suspensions. Urea hydrochloride is also useful in the neutralization of alkaline processing or waste streams, including those generated from paper manufacturing and recycling. Urea hydrochloride is especially useful in the removal or dissolution of calcium carbonate.

Urea hydrochloride can be formed with any desired ratio of urea and hydrochloric acid that performs the desired function. Examples of suitable salts include those formed by combining between 1:4 and 4:1 moles of urea with hydrochloric acid, more usually between 2.5 and 0.25 or 0.5 moles of urea with one mole of hydrochloric acid. A preferred composition contains at least approximately 1 mole of urea to one mole of hydrochloric acid, for example, a ratio of between approximately 1 and 2 moles of hydrochloric acid.

The use of urea hydrochloride to remove the build-up of water-insoluble metal salts on surfaces, and to dissolve water-insoluble metal salt dispersions or suspensions, has advantages over conventional methods using hydrochloric acid or other agents. For example, urea hydrochloride is less corrosive to metal equipment and other contact surfaces than the equivalent amount of hydrochloric acid, and has a significantly less tendency to release hydrogen chloride gas. Urea hydrochloride or its equivalent has the same or similar ability to dissolve insoluble salts or perform other functions as the equivalent amount of uncomplexed HCl, based on the total weight of HCl in the composition.

In a preferred embodiment, urea is the only base used in combination with hydrochloric acid in the composition. In an alternative embodiment, the salt of any strong acid with urea or other weak base can be used in place of urea hydrochloride if, when combined with a water insoluble metal salt, it produces a water soluble metal salt. Examples include mixtures of strong acids with, for example, alkanolamines, including triethanolamine, diethanolamine, monoethanolamine and $HO-[(alkyl)O]_x-CH_2)_yNH_2$, including $HO-[(CH_2)_xO]-CH_2)_yNH_2$; wherein the alkyl group can vary within the moiety, wherein x is 1–8 (which can vary within the moiety) and y is an integer of 1 to 40; alkylamines, dialkylamines, trialkylamines, alkyltetramines, polymers with amino or (alkyl or aryl)amino substituent groups, polymers with nitrogen-containing heterocyclic groups, acrylamide, polymers and copolymers of acrylamide, vinyl pyrollidone, polyvinyl pyrollidone, copolymers of vinyl pyrollidone, methacrylamide, polymethacrylamide, copolymers of acrylamide, and ammonia (which when combined with HCl forms ammonium chloride, which dissolves water-insoluble salts at a slow rate). Mixtures of these bases can also be used.

### DETAILED DESCRIPTION OF THE
### INVENTION

The term water insoluble salt refers to a salt that is soluble in water at a concentration of not greater than 1, and typically not greater than 0.1 gm/liter, under ambient conditions. The term water soluble salt refers to a salt that is soluble in water at a concentration of greater than that of a water insoluble salt.

The term alkyl, as used herein, unless otherwise specified, refers to a saturated straight, branched, or cyclic (in the case of $C_5$ or greater) hydrocarbon of $C_1$ to $C_{20}$, and specifically includes methyl, ethyl, propyl, isopropyl, butyl, isobutyl,

5,672,279

3

t-butyl, pentyl, cyclopentyl, isopentyl, neopentyl, hexyl, isohexyl, cyclohexyl, 3-methylpentyl, 2,2-dimethylbutyl, 2,3-dimethylbutyl, heptyl, octyl, nonyl, decyl, and dodecyl.

The term aryl, as used herein, refers to phenyl and substituted phenyl, wherein the substituent is amino, alkyl, halo (chloro, bromo, iodo, or chloro), hydroxy, sulfonyl, carboxylic acid, nitro, or a combination of these, and wherein the aromatic ring can have up to three substituents.

The invention as disclosed is, in one embodiment, a method to remove the build-up of water-insoluble metal salts on surfaces, and a method to lower the solids content of industrial liquids that contain water-insoluble metal salts using urea hydrochloride or its equivalent. In a specific embodiment, a method is provided to adjust the pH of textile treatment baths, effluent streams, and processing water, including effluent from paper manufacturing and recycling, using urea hydrochloride or its equivalent. Urea hydrochloride or its equivalent can also be used to adjust the pH of dying baths, and other aqueous baths, including recreational waters such as swimming pools and hot tubs.

Urea hydrochloride, as well as the equivalent strong acid/weak base salts disclosed herein, can also be used as an acid replacement in any process that hydrochloric acid (also referred to as muriatic acid) has traditionally been used in, including but not limited to acidizing (activation) of petroleum wells, boiler scale removal, ore reduction, food processing (e.g, corn syrup and sodium glutamate), pickling and metal cleaning, industrial acidizing, general cleaning (e.g., of membrane in desalination plants), alcohol denaturizing, production of vinyl chloride from acetylene and alkyl chlorides from olefins, hydrochlorination, polymerization reactions, isomerization, alkylation, and nitration reactions. Urea hydrochloride can replace traditional acids for solvation, in aqueous cleaning solutions, and in other processing solutions. Materials that can be cleaned include wire, metals, jewelry, printed circuit boards, wood, masonry, mortar, concrete, painted surfaces, plastics, polymeric substances, and the like.

In a preferred embodiment, urea hydrochloride or its equivalent disclosed herein is used to solubilize water insoluble metal salts, such as carbonates, for example, those with calcium, barium, aluminum, strontium, beryllium, and magnesium counterions.

Urea hydrochloride, as well as the equivalent strong acid/weak base salts disclosed herein, can be also be used to prepare surfaces for electroplating, and to clean surfaces used in the electronics industry.

Preparation of Urea Hydrochloride

Urea is weakly basic, forming salts with strong acids. Urea hydrochloride is a salt formed from the simple mixture of urea with hydrochloric acid. Common urea hydrochloride salts include the 1:1 urea to hydrochloric acid salt (CAS 506-89-8), and the 1:2 urea to hydrochloric acid salt. The 1:1 urea hydrochloric acid salt is sold by Esprit Chemical Company (Rockland, Mass.). Any desired ratio of urea to hydrochloric acid that performs the desired function can be prepared by simply mixing the appropriate ratios of components, typically in water. The mixing of urea with hydrochloric acid typically results in a slight exotherm that should be handled with care.

Any amount of urea hydrochloride can be used in the methods described herein, with any molar ratio of urea and hydrochloric acid, that performs the desired function. The preferred composition is a solution of hydrochloric acid and urea combined in a molar ratio of at least approximately 1 mole of urea to one mole of hydrochloric acid, or a slight

4

excess of urea, in water. This composition results in a hydrochloric acid urea salt solution that has the pH reduction ability and insoluble metal salt dissolution ability of hydrochloric acid but is less corrosive than hydrochloric acid.

Given the disclosure herein, one of ordinary skill in the art can easily manipulate the ratio of urea and hydrochloric acid, and the amount of urea hydrochloride used, to obtain a desired result. Methods to determine pH are well known to those of skill in the art.

It is recommended that the desired salt, as opposed to the individual components, be added to aqueous solutions to avoid a dilution effect, as well as corrosivity and safety problems associated with addition of the strong acid in uncomplexed form.

Additives

Additives can be added to the urea hydrochloride or equivalent solution as desired to increase the usefulness of the agent.

Additives include, but are not limited to, surfactants, hydrotropes (for example sodium or ammonium salts of alkyl sulfonic acid or aryl sulfonic acid, specifically including xylene sulfonic acid, toluene sulfonic acid, benzene sulfonic acid, cumene sulfonic acid, dodecylbenzene sulfonic acid, dodecyl diphenyloxide disulfonic acid, and naphthalene sulfonic acid), corrosion inhibitors, nitric acid (to increase the strength of the acid), cleaning agents (including detergents and shampoos), emulsifiers, and appropriate organic solvents.

Surfactants and emulsifiers are surface active agents that modify the surface energy between two liquid phases. The characteristics of surfactants and their applicability for a wide variety of applications are described by Rosen in *Surfactants and Interfacial Phenomena*, 2nd Edition (John Wiley and Sons, N.Y.), incorporated herein by reference. In general, the desired chemical structures of the hydrophilic and hydrophobic portions of the surfactant will vary with the nature of the solvent and the conditions of use. As discussed by Rosen, in a highly polar solvent such as water, the hydrophobic group can be, for example, a hydrocarbon, fluorocarbon or siloxane chain of proper length, whereas in a less polar solvent such as an alcohol, a very nonpolar moiety is required in the hydrophobic part of the surfactant. If a surface is to be made hydrophobic by the use of a surfactant, a cationic surfactant is usually preferred. If a surface is to be made hydrophilic, in general, then anionic surfactants should be considered. Nonionic surfactants adsorb onto surfaces with either the hydrophilic or hydrophobic group oriented toward the surface, depending on the nature of the surface.

EXAMPLE 1

Preparation of Urea Hydrochloric Acid 1:1 Salt.

To muriatic acid (65 parts of 20 degree baume (31.45% minimum, 32.5% average by weight)) was added prilled urea (35 parts). The mixture was mixed at room temperature, during which time a slight exotherm occurred.

EXAMPLE 2

Preparation of Urea Hydrochloric Acid 2:1 Salt.

To muriatic acid (130 parts of 20 degree baume (31.45% is minimum, 32.5% average by weight)) is added prilled urea (35 parts). The mixture is mixed at room temperature, during which time a slight exotherm occurs.

Strong Acid Weak Base Salts As Equivalents to Urea Hydrochloride

In an alternative embodiment, a salt formed by the combination of a strong acid with a weak base other than urea

5,672,279

## 5

hydrochloride is used to remove the build-up of water-insoluble metal salts on surfaces, and to lower the insoluble solids content of industrial liquids that contain water-insoluble metal salts.

A strong acid/weak base salt should be selected that forms a water soluble salt when mixed with a water insoluble salt under the conditions of use. Certain salts of urea, such as urea sulfate, cannot be used, for example, to remove the build-up of calcium carbonate because they form new water insoluble salts, i.e., calcium sulfate.

Strong acids are acids that are completely ionized in water. Ebbing, D. D., and Wrighton, M. S., "General Chemistry, Second Edition," Houghton Mifflin Company, Boston, pp. 327 (1987). Examples of strong acids include mineral acids such as nitric, hydrochloric, hydrobromic, hydroiodic, hydrofluoric, and others. Some acids commonly considered "weak" acids are also suitable, including but not limited to formic, acetic, hydroxyacetic, and thioglycolic acids.

Weak bases are bases that are only partly ionized in water. Ebbing, D. D., and Wrighton, M. S., "General Chemistry, Second Edition," Houghton Mifflin Company, Boston, pp. 327 (1987). Nonlimiting examples of organic and inorganic bases are found on pages 8–37 through 8–39 in the "CRC Handbook of Chemistry and Physics," 72nd Edition, CRC Press, (1992), hereby incorporated by reference. Examples of weak bases include urea acetylurea, alkanolamines, including triethanolamine, diethanoamine, monoethanolamine and $HO-[(alkyl)O]_x-CH_2)_yNH_2$, including $HO-[(CH_2)_xO]-CH_2)_yNH_2$; wherein the alkyl group can vary within the moiety, wherein x is 1–8 (which can vary within the 5 moiety) and y is an integer of 1 to 40; alkylamines (including methylamine, ethylamine, propylamine and butylamine), dialkylamines, alkyldiamines (including ethylenediamine), alkyltriamines, alkyltetramines, and trialkylamines, polymers with amino or (alkyl or aryl)amino substituent groups, including (mono or di)-alkylaminoalkylacrylate, and (mono or di)alkylaminoalkylmethacrylate, polymers with nitrogen-containing heterocyclic groups (including but not limited to pyridine, pyrimidine, imidazole, tetrazole, pyrazine, quinoline, isoquinoline, indole, isoindole, benzimidazole, purine, pyrrole, is pyrazole, quinazoline, pyridazine, pyrazine, cinnoline, phthalazine, quinoxaline, xanthine, hypoxanthine, and pteridine); amides, including formamide, acetamide, acrylamide, polymers and copolymers of acrylamide, and cyclic amides such as caprolactam; pyrollidone, polyvinyl pyrollidone, copolymers of vinyl pyrollidone, methacrylamide, polymethacrylamide, copolymers of methacrylamide, ammonia, guanidine, hydroxyurea, semicarbazide; mono-, di-, or tri(alkyl or aryl)urea, and wherein in the case of di(alkyl or aryl)urea the alkyl or aryl groups can be on the same or different nitrogen atoms, O-methyl hydroxyl amine (methoxylamine), aniline, and hydrazine. Preferred bases are nitrogenous bases. Certain metal hydroxides, such as calcium and barium hydroxide, are weak bases and have low solubility in neutral media. However, they react with strong acids to form water and metal salts. These bases are not preferred because the resulting metal salts are relatively insoluble, compared to the acid salts of nitrogenous bases.

Examples of suitable salts include any salt that is formed by the combination of one or more of the acids listed above with one or more of the bases listed above, in any desired molar ratio. Examples specifically include urea hydrogen nitrate, ammonium chloride, urea hydrobromide, urea hydroiodide, urea hydrofluoride, formamide hydrochloride,

## 6

and the HCl, HI, HBr, or HF salts of pyrollidone or poly-vinylpyrollidone.

As a nonlimiting example, a 1:1 HCl salt of polyvinylpy-rollidone (PVP) can be prepared by mixing 36 grams of 20 degree baume HCl with 36 grams of PVP (average MW 29,800) and 28 grams of water.

A useful composition is a mixture of HCl, $HNO_3$, and urea, in any selected ratio. Mixtures of HCl and $HNO_3$ are known as aqua regia, a very strong acid that can dissolve almost any material, including gold. $HCl/HNO_3$ mixtures are commonly used to clean very dirty equipment. A disadvantage of $HCl/HNO_3$ is its extreme corrosiveness and its noxious fumes. A mixture of HCl, $HNO_3$, and urea provides the benefits of aqua regia while minimizing its corrosiveness and fumes. In a preferred composition, an amount of urea or other weak base, or combination thereof, is used that is at least equal to, and preferably greater than, the combined acid units of HCl and $HNO_3$ based on equivalents.

Any molar ratio of strong acid to weak base that serves the desired purpose can be used within the scope of this invention. Typical ratios, in terms of acid or base equivalents, are typically between approximately 4 to 1 and 1 to 4 acid:base equivalent units or a slight excess of base, in equivalence units. As with urea hydrochloride, at least one equivalent unit of base, or a slight excess of base, per equivalent unit of acid, is preferred.

Combinations of any of the weak bases described herein in combination with nitric acid, for example, urea nitrate, can be used as an acid replacement for any purpose that nitric acid is used for, including but not limited to, in the manufacture of ammonium nitrate for fertilizer and explosives, in organic syntheses, including in the preparation of nitro-containing compounds, in metallurgy, in photoengraving, in etching steel, in ore floatation, in the production of urethane and rubber chemicals, and in reprocessing spent nuclear fuel.

Combinations of any of the weak bases described herein in combination with hydrofluoric acid, such as urea hydrofluoride, for example, can be used as an acid replacement for any purpose that hydrofluoric acid or hydrogen fluoride is used for, including but not limited to, as a catalyst in alkylation, isomerization, condensation, dehydration, and polymerization reactions, as a fluorinating reagent in organic and inorganic reactions, in the production of aluminum, fluorine and aluminum fluoride, as an additive in liquid rocket propellants, in etching glass, in pickling stainless steel, and in the refining of uranium. Combinations of any of the weak bases described herein in combination with hydroiodic acid, such as urea hydroiodide, for example, can be used as an acid replacement for any purpose that hydroiodic acid or hydrogen iodide is used for, including but not limited to, the preparation of iodine salts, in organic preparations, as an analytical reagent, as a disinfectant, and in the preparation of pharmaceuticals.

Use of Urea Sulfate or its Equivalent

The following examples are nonlimiting examples of procedures for the removal of the build-up of water-insoluble metal salts on surfaces, and the dissolution of water-insoluble metal salt dispersions or suspensions. Given these examples, anyone of skill in the appropriate art can use the method disclosed herein to achieve the desired purpose.

### EXAMPLE 3

Use of Urea Hydrochloride to Clean Masonry

A solution of urea hydrochloride is prepared by mixing 1 part water with 1 part of the produce of Example 1. The solution is applied to masonry, and the masonry optionally

5,672,279

7

brushed or otherwise abraded appropriate. The masonry is then rinsed off with water.

### EXAMPLE 4

Use of Urea Hydrochloride to Clean Boiler Scale

A solution of urea hydrochloride is prepared by mixing 3 parts water with 1 part of the product of Example 1. The boiler is filled with the solution, and then flushed as appropriate, typically after cessation of $CO_2$ evolution.

Modifications and variations of the present invention will be obvious to those skilled in the art from the foregoing detailed description of the invention. Such modifications and variations are intended to come within the scope of the appended claims.

8

We claim:

1. A method to solubilize calcium carbonate in aqueous suspensions or dispersions of calcium carbonate that includes adding to the suspensions or dispersions a sufficient amount of urea hydrochloride to convert the calcium carbonate to a water soluble salt, wherein a molar ratio of urea to hydrochloric acid approximately between 1:4 and 4:1 is used to form said urea hydrochloride.

2. The method of claim 1, wherein the calcium carbonate is in paper manufacturing process water.

3. The method of claim 1, wherein said ratio of urea to hydrochloric acid is approximately 2:1.

4. The method of claim 1, wherein said ratio of urea to hydrochloric acid is approximately 1:1.

5. The method of claim 1, wherein the calcium carbonate is in paper recycling process water.

* * * * *